Leonora M. Schloss (SBN 145142)
Leonora.Schloss@jacksonlewis.com
Sevada Hakopian (SBN 330602)
Sevada.Hakopian@jacksonlewis.com
JACKSON LEWIS P.C.
725 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5408
Telephone: (213) 689-0404
Facsimile: (213) 689-0430

Attorneys for Defendants
UNION OF ORTHODOX JEWISH
CONGREGATIONS OF AMERICA
AND NACHUM RABINOWITZ

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YAAKOV MARKEL,<br><br>  Plaintiff,<br><br>  v.<br><br>UNION OF ORTHODOX JEWISH CONGREGATIONS OF AMERICA, a corporation; Nachum Rabinowitz, an individual; DOES 1-100,<br><br>  Defendants. | Case No.: 2:19-cv-10704-JWH-SK<br><br>[Assigned for all purposes to the Honorable John W. Holcomb, Courtroom 9D]<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS THE UNION OF ORTHODOX JEWISH CONGREGATIONS AND NACHUM RABINOWITZ'S MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: October 28, 2022<br>Time: 9:00 a.m.<br>Dept: 9D – 9th Floor<br>Ronald Reagan Fed. Bldg<br>411 W. 4th Street<br>Santa Ana, CA 92701<br><br>[Federal Rules of Civil Procedure Rule 56]<br><br>[Filed concurrently with Notice of Motion and Motion; Request for Judicial Notice; Joint Statement; Evidentiary Objections; Joint Exhibit; Declaration of Leonora M. Schloss; and [Proposed] Order] |

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................6

II.     SUMMARY OF UNDISPUTED MATERIAL FACTS..........................................8

        A.      The Union of Orthodox Jewish Congregations of America is a Thoroughly and
                Avowedly Religious Institution and its Mission is to Serve the Orthodox Jewish
                Community. .....................................................................................................8

        B.      Plaintiff Worked for the Orthodox Union of Jewish Congregations as a Supervisor
                of Kashruth (known by the Hebrew term "*mashgiach*"), the System of Jewish
                Rules that Ensures that Food Products are Kosher According to Religious
                Regulations. ..................................................................................................10

III.    ARGUMENT ......................................................................................................12

        A.      Summary Judgment Standard .........................................................................12

        B.      The Ministerial Exception Exempts Religious Organizations From Liability
                Arising From Employment-Related Claims Made By A Religious Figure. .........12

                1.      Overview of the Ministerial Exception. ................................................12

                2.      The Union of Orthodox Jewish Congregations is a "Religious
                        Organization" Within the Meaning of the Ministerial Exception. ...........15

        C.      The Ministerial Exception Bars Plaintiff's Claims for Violations of the California
                Labor Code Because Plaintiff's Duties As a *Mashgiach* Were Religious in Nature,
                and Integral to the Union of Orthodox Jewish Congregation's Religious Mission. ..........16

                1.      The Supreme Court's Decision in *Morrisey-Berru* Establishes That
                        Plaintiff was a Minister Within the Meaning of the Ministerial Exception. ..........17

                2.      The Primary Duties of a Mashgiach Are Religious in Nature and Plaintiff
                        Was a Religious Figure Within the Meaning of the Ministerial Exception. ...............20

                3.      Plaintiff Acknowledged And Understood That His Position Existed to
                        Ensure the Kosher Integrity of Grape Products Adhered to the Tenets of
                        the Jewish Faith. .................................................................................21

        D.      Ninth Circuit Courts Have Held that the Ministerial Exception Exempts Religious
                Institutions From State Law Based Wage and Hour Claims. .............................21

        E.      The Instant Case is Easily Distinguishable from California Cases Denying
                Application of the Ministerial Exception to Non-Ministerial Employees. .........25

        F.      Plaintiff's Causes of Action for Fraud and Negligent Misrepresentation Are
                Precluded by the Ministerial Exception. .........................................................27

        G.      Plaintiff's Cause of Action for Unfair Business Practices, Violation of California
                Business and Professions Code § 17200, et. seq. Is Barred By the Ministerial
                Exception. ....................................................................................................28

        H.      The Ministerial Exception Applies to Rabbi Rabinowitz. .................................28

IV.     CONCLUSION ..................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adams v. Indiana Wesleyan Univ.*,
  2010 WL 2803077 (N.D. Ind. July 15, 2010).................................................20

*Alcazar v. Corp. of Catholic Archbishop*,
  598 F.3d 668 (9th Cir. 2010) .........................................................22, 23, 24, 25

*Alcazar v. Corp. of the Catholic Archbishop of Seattle*,
  627 F.3d 1288 (9th Cir. 2010)(en banc) .......................................22, 23, 24, 25

*Alicea-Hernandez v. Catholic Bishop*,
  320 F. 3d 698 (7th Cir. 2003) .......................................................................20

*Anderson v. Libery Lobby, Inc.*,
  477 U.S. 242 (1986) ......................................................................................12

*Biel v. St. James School* (9th Cir. 2018)
  911 F.3d 603 ..................................................................................................26

*Bollard v. Cal. Province of the Soc'y of Jesus*,
  196 F.3d 940 (9th Cir. 1999) .........................................................................24

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).......................................................................................12

*Colon v. InterVarsity Christian Fellowship*,
  777 F.3d 829 (6th Cir. 2004) .........................................................................15

*Elvig v. Calvin Presbyterian Church* (9th Cir. 2004)
  375 F.3d 951 ............................................................................................22, 28

*Guadalupe Sch. v. Morrissey-Berru*,
  140 S. Ct. 2049 (July 2020) ......................................................................7, 13

*Headley v. Church of Scientology Int'l*,
  No. CV 09-3987 DSF 2010 U.S. Dist. LEXIS 40533 (C.D. Cal. April 2,
  2010) ..............................................................................................................28

*Hosana-Tabor Evangelical Lutheran Church and School v. EEOC*,
  565 U.S. 171 (2012)................................................................................*passim*

*McCants v. Alabama -West Fla. Conf. of the United Methodist Church, Inc.*,
    No. 08-0686-KD-C, U.S. Dist. LEXIS 45705 (S.D. Ala. May 29, 2009)....................29

*McClure v. Salvation Army*,
    460 F.2d 553 (5th Cir. 1972) ..................................................................... 13, 14, 15

*Mitchell v. Helms*,
    530 U.S. 793 (2000) (plurality opinion) ........................................................ 16

*NLRB v. Catholic Bishop of Chi.*,
    440 U.S. 490 (1979).......................................................................................25

*Puri v. Khalsa*,
    844 F.3d 1152 (9th Cir. 2017) ...................................................................... 13

*Ross v. Metro. Church of God*,
    471 F. Supp. 2d 1306 -1307 and 1312 ........................................................ 28

*Scharon v. St. Luke's Episcopal Presbyterian Hosp.*,
    929 F.2d 360 (8th Cir. 1991) ....................................................................... 13

*Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*,
    363 F. 3d. 299 (4th Cir. 2004) ...............................................................*passim*

*Shand v. Charles E. Smith Life Cmtys.*,
    2019 U.S. Dist. LEXIS 16181 (2019)........................................................... 16

*Silicon Knights v. Crystal Dynamics*,
    983 F. Supp. 1303 (N.D. Cal. Oct. 23, 1997) .............................................. 28

*Stambanis v. TWBA Worldwide, Inc.*
    2:19-cv-03962-ODW U.S. Dist. LEXIS 144058 (C.D. Cal. August 23,
    2019) .............................................................................................................. 28

*Stately v. Indian Cmty, Sch. of Milwaukee, Inc.*,
    351 F. Supp. 2d 858 (E.D. Wis. 2004) ........................................................ 20

*Wechsler v. Orthodox Union*,
    2008 U.S. Dist. LEXIS 105780 (2009)................................................... 16, 19

*Werft v. Desert Southwest Annual Conference of the United Methodist
    Church* (9th Cir. 2004)
    377 F.3d 1099 ........................................................................................ 22, 24

*Whittlestone, Inc. v. Handi-Craft, Co.*,
    618 F.3d 970 (9th Cir. 2010) ....................................................... 27

**California Cases**

*Henry v. Red Hill Evangelical Lutheran Church of Tustin* (2011)
    201 Cal. App.4th 1041 ............................................................... 22

*Higgins v. Maher*,
    210 Cal.App.3d 1168 (1989) ...................................................... 29

*Schmoll v. Chapman Univ.*,
    70 Cal.App.4th 1434 (1999) ................................................ 15, 16

*Su v. Stephen S. Wise Temple* (2019)
    32 Cal. App. 5th 1159 ...................................................... 25, 26, 27

**Other State Cases**

*Denny v. Prince*
    68 Va. Cir. 339 (2005) (*See also McNeil v. Mo. Annual Conf. of the
    United Methodist Church,* 2-10-cv-04154-NKL, 2010 U.S. Dist. LEXIS
    98184 (W.D. Mo. September 20, 2010)) ..................................... 29

*Kirby v. Lexington Theological Seminary*,
    426 S.W. 3d 597 (Ky. 2015) ....................................................... 20

**Federal Statutes**

42 U.S.C.
    § 1981(a) .................................................................................... 28

Fed. R. Civ. P.
    § 56(c) ........................................................................................ 12

**California Statutes**

California Business & Professions Code
    § 17200, *et seq.* ..................................................................... 6, 28

California Labor Code
    § 226 ............................................................................................ 6
    §§ 1194(a) and 510 ..................................................................... 6

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Defendants the Union of Orthodox Jewish Congregations of America (hereinafter the "OU") and Rabbi Nachum Rabinowitz (hereinafter "Rabbi Rabinowitz")(collectively, "Defendants"), submit this Memorandum of Points and Authorities in support of their Motion for Summary Judgment.

Plaintiff Yaakov Markel ("Plaintiff") alleges that, from 2011 until his resignation in 2018, he worked for the OU as a supervisor of kashruth (known by the Hebrew term "mashgiach"), which is the system of Jewish rules that ensures that food products are kosher according to religious regulations. (Complaint, ¶ 6.)  Plaintiff's role was to oversee the kashruth of grape products at two wineries – Delano Growers Grape Products ("Delano") and San Joaquin Valley Concentrates ("Gallo").  (*Id.*)  Plaintiff alleges that he was a non-exempt employee of the OU and that he is owed for unpaid double-time hours worked. (Complaint, ¶ 10.)  Plaintiff contends that Defendants committed "fraud, deceit, and engaged in negligent misrepresentation and unfair business practices," by virtue of entering into a series of oral agreements wherein Defendants represented that they would hire Plaintiff to a salaried management position, with no intention of doing so, and strung Plaintiff along to avoid paying proper hourly wages. (Complaint, ¶ 7-45.)[1]  Plaintiff's allegations are without merit and fail as a matter of law.

Defendants are entitled to summary judgment because Plaintiff's claims are expressly barred by the "ministerial exception," established under the Free Exercise and Establishment Clauses ("Religion Clauses") of the First Amendment to the United States Constitution.  The ministerial exception exempts religious institutions, such as the OU, from liability arising from employment-related claims brought by a religious figure and

---

[1] Plaintiff Yaakov Markel's Complaint (the "Complaint") alleges the following causes of action against Defendants: (1) Violation of California Labor Code §§ 1194(a) and 510 – failure to pay overtime compensation applicable to Plaintiff as a non-exempt employee; (2) Unfair Business Practices in violation of California Business & Professions Code §17200, *et seq.*; (3) Fraud and Deceit; (4) Negligent Misrepresentation; and (5) Violation of California Labor Code § 226 – failure to provide itemized wage statements.  (Plaintiff's Complaint, Docket ("Dkt.") 1-2.

prohibits a court from second-guessing the reasons for employment and administration decisions, whether religious, non-religious, valid or pretextual. (*See Hosana-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171, 192 (2012).)

In this case, the ministerial exception bars Plaintiff's employment-related claims because Plaintiff is a mashgiach (*i.e.*, a religious figure), and his allegations against the OU challenge the OU's decision-making regarding who serves as a mashgiach, and how they are compensated. The United States Supreme Court applied this powerful defense as recently as July 2020, in dismissing the employment discrimination claims brought by two former lay teachers at a Catholic school because they were "ministers." (*See Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (July 2020).) The ministerial exception bars Plaintiff's claims in the case because the undisputed material facts establish that: (1) the OU is a religious institution, and (2) Plaintiff's primary duties as a mashgiach were inherently religious in nature, sufficient to qualify as a "minister" within the meaning of the ministerial exception.

Furthermore, since the OU is undoubtedly an avowed religious institution, and the essence of Plaintiff's work as a mashgiach was inherently religious in nature, to permit Plaintiff to proceed with claims against the OU is improper and a clear violation of the Religion Clauses. Plaintiff's claims fall squarely within the scope of the ministerial exception, which encompasses *all* tangible employment actions, and disallows lawsuits for damages based on lost or reduced pay. Decisions made by the OU – by and through its Senior Rabbinic Coordinator, Defendant Rabbi Rabinowitz – concerning Plaintiff's appointment, retention and compensation in service of the OU's Jewish religious community, are matters that cannot be properly litigated in the civil courts.[2]

The summary judgment record submitted by Defendants, and discussed below, contains an abundance of irrefutable evidence that the OU is a religious institution, at which

---

[2] Upon receipt of Plaintiff's Complaint, on November 20, 2019, Defendants wrote Plaintiff a letter informing him that the appropriate venue for his complaint is a Beth Din Rabbinical court, as required by Jewish law, not a California state court. See Joint Statement of Undisputed Facts, UMF No. 22.

Plaintiff acted as a religious figure as a mashgiach, who performed the religious function of ensuring the kosher integrity of grape concentrate for those religious Jews who keep kosher.  Plaintiff's Complaint is therefore barred entirely by the First Amendment's ministerial exception.  Accordingly, Defendants respectfully request that the Court grant their motion for summary judgment.

## II.    SUMMARY OF UNDISPUTED MATERIAL FACTS

### A.    The Union of Orthodox Jewish Congregations of America is a Thoroughly and Avowedly Religious Institution and its Mission is to Serve the Orthodox Jewish Community.

The OU is one of the largest Orthodox Jewish synagogue organization, representing several hundred congregations across the United States. (Undisputed Statement of Material Fact ("UMF") No. 1.)  The OU is organized as a 501(c)(3) "not for profit" corporation and receives donations from individuals, foundations, and synagogues. (UMF Nos. 2-3; 51-53.) The OU is a religious organization, given its mission of serving the Orthodox Jewish Community – whose religious observance is based on performance of religious activities and rituals in nearly every facet of everyday life. (UMF No. 4; 54.)  The OU provides many services and programs in service of its association and community of synagogues, aligned with its mission to engage, strengthen, and lead the Orthodox Jewish community, and inspire the greater Jewish community. (UMF No. 5.)  The OU provides its religious activities to its association of synagogues and community.  As referenced on its website (www.ou.org), it offers numerous programs which broadly include religious advocacy and religious study programs, religious youth programs and kosher food certification. (UMF No. 6.)  One of the OU's primary activities in service to its association of synagogues and Orthodox community is ensuring the wide availability of kosher food by serving as the leading national certification agency of kosher food products. (UMF No. 7.)

The essence of Orthodox Judaism is conducting one's life in accordance with *halacha*, the millennia-old body of Jewish law that governs how Jews should pray, eat, dress, conduct business, care for themselves and others, and carry out innumerable other activities of daily life, big and small. (UMF No. 8.)  For Orthodox Jews, *halacha's*

comprehensive regulation of everyday life makes the performance of all manner of seemingly secular activities a matter of religious obligation and practice. (UMF No. 9.)

For both Orthodox Jews and Orthodox Jewish institutions, complying with *halachic* rules "within the realm of secular law," *id.*, is as much a religious obligation as complying with rules governing prayer and rituals. (UMF No. 10.) *Cf.  Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F. 3d. 299, 309 (4th Cir. 2004)("Jews view their dietary laws as divine commandments, and compliance therewith is as important to the spiritual well-being of its adherents as music and song are to the mission of the Catholic church.").

One of the essential rituals followed by the Orthodox Jewish community is the observance of kashruth, or keeping kosher, the body of Jewish religious laws concerning the suitability of food, and the fitness for use of ritual objects.  (UMF No. 11.) The OU provides Kosher Certification, which verifies that a product's ingredients, production facility and actual production derivatives, tools and machinery meet kosher standards. (UMF No. 12.)  The OU's Kosher Certified symbol Ⓤ– a religious kosher certifying symbol – assures consumers that both the actual product and its production adhere to all Kosher law requirements.  The symbol is sometimes used as a marketing tool by its customers to enable them to sell their products and services to consumers throughout the United States and to an expanded group of consumers.  (UMF No. 13.)

The OU certifies grape products and wine as kosher and retains mashgiachim (plural of mashgiach) – who must be a verified Sabbath observing Jew with basic knowledge of the concepts of Jewish laws pertaining to winemaking – to oversee the kashruth of grape products. (UMF No. 14.)  Since grape products are unique in all of kosher, there are additional, specific requirements and qualifications that must be met to be considered kosher, including restrictions on exclusive handling and manipulation by Sabbath observing Jews during certain periods. (UMF No. 15.)  Because Kosher law demands high standards, adherence to dietary restrictions and laws, part of the OU's mission in serving the Orthodox Jewish community is providing assurances that products it certifies adhere to Kosher criteria, as the Jewish consuming public rely on the OU to only certify products

that meet these standards. (UMF No. 16.)

While the OU's Kosher Division earns income, that income is used to fund the OU's initiatives to further its mission to serve the Orthodox Community. (UMF Nos. 2-7; 49.)

**B.    Plaintiff Worked for the Orthodox Union of Jewish Congregations as a Supervisor of Kashruth (known by the Hebrew term "*mashgiach*"), the System of Jewish Rules that Ensures that Food Products are Kosher According to Religious Regulations.**

To become a mashgiach, one must be Jewish, Sabbath-observant (shomer Shabbat), Torah-observant (shomer mitzvot), and personally fulfilling the laws of kashrut (shomer kashrut). (UMF No. 19.) The OU views mashgiachs as ambassadors of the Jewish people who provide a religious function. (UMF No. 20.) A mashgiach must be knowledgeable about Jewish law and plays a social and technical role in explaining kosher rules to the Jewish and non-Jewish community and forging close relationships with employees and customers. (UMF No. 21.)

By Plaintiff's own admission in his Complaint, Plaintiff avers that he worked for Defendant "as a supervisor of kashruth (known by the Hebrew term 'mashgiach'), the system of Jewish rules that ensures that food products are kosher according to religious regulations." (UMF No. 23.)    Further, Plaintiff avers that he worked "at facilities where defendant OU had contracts to oversee the kashruth of grape products, in Delano, California (at Delano Growers Grape Products ["Delano"] and Fresno, California (at San Joaquin Valley Concentrates ["Gallo"]. (UMF No. 24.)

During deposition, Plaintiff admitted that kashruth is connected with keeping kosher, which entails certain dietary restrictions and adhering to Jewish law. (UMF No. 25.)  The evidence demonstrates that Plaintiff referred to himself in internal and external correspondence with the OU's clients as the "Head Mashgiach." (UMF No. 26.) The evidence also demonstrates that Plaintiff, as the Head Mashgiach, wrote the job descriptions for mashgichim performing hashgacha (*i.e.* Rabbinic supervision by a mashgiach) and detailed instructions via email regarding the religious work to be done at Delano and Gallo. (UMF No. 27.)  Plaintiff advised mashgichim (in writing) that his role

was to oversee the production of grape juice concentrate and, because "grape product is not mevushal (cooked or boiled) until the final step in the process, the goyim (non-Jewish person), may not have any direct involvement in its production. . . . Mashgichim will run the presses, evaporators, pumps, sluicing, etc.  Everything will be done by [mashgichim] down to the smallest act of opening a valve to take a sample. . . . only your alertness and involvement is what will make this a 100% kosher product." (UMF No. 28.)[3]

Additionally, the OU required Plaintiff, like all mashgichim, to submit a letter from an Orthodox Rabbi certifying that he was a Sabbath observer.  (UMF No. 29.) The purpose of the certification was to obtain assurances from an ordained rabbi – and head of a synagogue – that the mashgiacism they hired were trustworthy and fit for the role to carry out the OU's religious mission.  (UMF No. 30.)

Further, Plaintiff is an observant Jew[4] and was raised in a religious Jewish Orthodox home in which his father ran a kosher supervision agency (UMF No. 31.)  Plaintiff attended Jewish Day school wherein he also learned about keeping kosher (UMF No. 33.)  Plaintiff testified that he acquired experience working at wineries as a mashgiach in 2001, under a different kosher supervising agency, 10 years before he commenced working for the OU. (UMF No. 34.)  Moreover, Plaintiff worked at his father's kosher supervision agency for years prior to working for the OU. (UMF No. 35.) Plaintiff understood that, under Orthodox standards for keeping kosher, every ingredient of the product processed should be kosher compliant and that 100% of the work involved was to ensure the kosher integrity of the product. (UMF Nos. 36.)  Plaintiff himself wrote emails in which he lays out the foundation of his ministerial duties including: the application of the OU's policies and procedures with respect to the kashruth of grape products; and required consultation with senior management of the OU or the halachic (Jewish law) poskim (experts) when

---

[3] See Joint Statement Part D, 261-63, Plaintiff's Document Production 05808, email dated Aug. 7, 2017, UMF No. 28. In the same email correspondence, Plaintiff admits that the mashgichim were in charge of making a "kosher for Pesach product" meaning for the religious Passover holiday, further evidencing the religious nature of the work performed.
[4] See Joint Statement Part D, 258-60 Plaintiff's document production 02847, email dated July 22, 2015, UMF No. 32 wherein Plaintiff refers to himself as a "Frum Jew," which is a Yiddish word that describes Jewish religious devotion.

deviations from the OU's kashruth policies arose. (UMF No. 37.) Plaintiff was provided materials from poskim (experts) that assisted him with his duties as a Mashgiach. (UMF No. 38.) While performing work for the OU, Plaintiff was required to understand the specific concepts of Jewish laws of winemaking, and kosher requirements generally, and to report urgent halachic issues to Rabbis Rabinowitz and Kantor. (UMF No. 39.) Plaintiff would give non-Jewish workers at the wineries instructions regarding how to maintain kosher standards at the facility. (UMF No. 40.)

Plaintiff testified that, while performing mashgiach work at Delano, he trained others regarding the procedure for koshering (cleaning to kosher specification) tanks and was involved in implementing the OU's policies, and tasked with maintaining the kosher integrity of the product being processed at Delano. (UMF Nos. 41-44.)

## III.   ARGUMENT

### A.   Summary Judgment Standard

Summary judgment must be granted if the pleadings, discovery, and exhibits show there is no genuine issue as to any material fact. (Fed. R. Civ. P. § 56(c).) Once the moving party has shown no genuine issues of material facts exist, the non-moving party must go beyond the pleadings and offer sufficient proof to establish his burden of proof by providing specific facts that create a material issue. (*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).) A minor factual dispute will not preclude summary judgment if there is no "genuine" issue of material fact. (*Anderson v. Libery Lobby, Inc.*, 477 U.S. 242, 247—48 (1986).)

### B.   The Ministerial Exception Exempts Religious Organizations From Liability Arising From Employment-Related Claims Made By A Religious Figure.

Because the OU is a religious organization and Plaintiff was a religious figure, or "minister" within the scope of the ministerial exception, Defendants are entitled to judgment as a matter of law on each of Plaintiff's claims.

#### 1.   Overview of the Ministerial Exception.

The Free-Exercise Clause of the First Amendment protects a religious institution's right to shape its own faith and mission through the selection and governance of its

ministers. (*Hosanna-Tabor*, 565 U.S. at 188.)  The Establishment Clause prohibits government involvement in ecclesiastical decisions, including determining who will minister to the religions organization's faithful.  (*Id*. at pp. 188-189.)  For nearly fifty years, the courts have recognized the existence of the "ministerial exception" grounded in these Religion Clauses to the First Amendment.  (*See Scharon v. St. Luke's Episcopal Presbyterian Hosp.*, 929 F.2d 360, 363 (8th Cir. 1991); *McClure v. Salvation Army*, 460 F.2d 553, 559-560 (5th Cir. 1972); *Puri v. Khalsa*, 844 F.3d 1152, 1157 (9th Cir. 2017).)

In 2012, the United States Supreme Court affirmed the existence of the "ministerial exception" grounded in these Religion Clauses in *Hosanna-Tabor*.  (*Hosanna-Tabor*, 565 U.S. at p. 188.)  Therein, the Court declared that the ministerial exception precludes civil court intrusion into a religious organization's selection, administration, evaluation, discipline, and governance of its ministers. (*Id*. at 188.)

As the Supreme Court most recently affirmed in July 2020 in the case of *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2072 (July 2020), in applying the ministerial exception to two "lay" teachers at Catholic schools:

> The ministerial exception . . . categorically bars certain antidiscrimination suits by religious leaders against their religious employers. When it applies, the exception is extraordinarily potent: It gives an employer free rein to discriminate because of race**,** sex, pregnancy, age, disability, or other traits protected by law when selecting or firing their "ministers," even when the discrimination is wholly unrelated to the employer's religious beliefs or practices.  That is, an employer need not cite or possess a religious reason at all; the ministerial exception even condones animus.

(internal citations omitted, emphasis added.)

The ministerial exception applies to any employment decision that would infringe upon a religious organization's ability to decide who will be its minister, *i.e.* who will personify its beliefs and disseminate its religious message.  In *Hosanna-Tabor*, the Supreme Court held that the ministerial exception barred any retaliation or discrimination claim and prohibited any relief for a church's decision to terminate an unwanted minister.

(*See Hosanna-Tabor*, 565 U.S. at p. 194.)  The Court explained:

> Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision.  Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who personify its beliefs . . . .[T]he First Amendment has struck the balance for us.  The church must be free to choose those who guide it on its way.

(*Id.* at 188, 196)(emphasis added.)

The ministerial exception does not only apply to the hiring and firing of ministers, but **also to the broader relationship** between an organized religious institution and its ministers.  (*See McClure*, 460 F.2d at 559 (the minister is the chief instrument by which the religious organization seeks to fulfill its purpose, so "*[m]atters touching* this relationship must necessarily be recognized as of prime ecclesiastical concern.")(emphasis added); *Hosanna-Tabor*, 565 U.S. at pp. 194-195 (all allegations merely "**concerning the employment relationship between a religious institution and its ministers**" are barred by the ministerial exception. (emphasis added)).

The Supreme Court in *Morrisey-Berry* held that the First Amendment broadly prohibits courts from intervening in "employment disputes" involving ministers at religious schools. (*Id.* at 2060.)  The ministerial exception protects a religious school's "autonomy with respect to internal management decisions that are essential to the institution's central mission." (*Id.*)  "Under this rule, courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." (*Id.*)

Furthermore, the ministerial exception bars discrimination, harassment and retaliation claims whether the alleged underlying conduct deals with an adverse employment action, such as termination, or other types of conduct that occurred during a minister's employment.  For instance, in *McClure*, the Fifth Circuit held that a minister's sex discrimination claim based on allegations that she received less salary and fewer benefits than male employees, and was discharged in retaliation for complaints she made

to the EEOC, were all barred by the First Amendment:

> Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern.  Just as the initial function of selecting a minister is a matter of church administration and government, so are the functions which accompany such a selection.  It is unavoidably true that these include the **determination of a minster's salary,** his place of assignment, and the duty he is to perform in the furtherance of the religious mission of the church.

(*McClure*, at pp. 558-560 (emphasis added).

### 2. The Union of Orthodox Jewish Congregations is a "Religious Organization" Within the Meaning of the Ministerial Exception.

At the outset, it is well established that the OU is a religious institution with a substantial religious character and purpose that qualifies as a "religious organization" within the meaning of the ministerial exception. (UMF Nos. 1-20; 54.)  In 1913, by act of law, the OU was incorporated and its defining role was to "uphold and strengthen the observance of orthodox Judaism, otherwise designated as traditional, historical or biblical-rabbinical Judaism, by associating and uniting such congregations, organizations and individuals as adhere to or profess orthodox Judaism and affording them mutual aid and encouragement in religious faith and devotion to their common ideals, . . . to promote the interests of orthodox Judaism by all lawful and proper means."  (UMF No. 54.) For purposes of the ministerial exception, religious institutions are those with missions "marked by clear or obvious religious characteristics," and the exception "applies to multidenominational and nondenominational religious organizations." (*Colon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 834 (6th Cir. 2004)).   A religious institution need not be a church or synagogue to qualify; religious nursing homes, elementary schools, and campus ministry groups have all been deemed to be religious institutions. (*Id.* at 833; *See also Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299, 309-10 (4th Cir. 2004)  Further, the ministerial exception extends to church-related institutions which have a "substantial religious character." (*Schmoll v.*

1  *Chapman Univ.*, 70 Cal.App.4th 1434, 1439 (1999) (citing *Scharon*, 929 F.2d at p.
2  362)(internal quotations omitted).)

3      Here, the religious character and purpose of the OU is clear – it exists to serve the
4  Orthodox Jewish community. (UMF Nos. 1-20; 54.)   The OU's mission is to engage,
5  strengthen, and lead the Orthodox Jewish community, and inspire the greater Jewish
6  community. (*Id.*) It is known as one of the largest and most influential Jewish organizations
7  in the world.  (UMF No. 1.) The OU's kashruth division certifies as kosher products for
8  those religiously observant Jews who desire to only purchase and consume kosher
9  products. (UMF Nos. 6-21, 23.)  In fact, a District Court has already held the OU and its
10  kashruth division constitute a religious organization for ministerial exception purposes.
11  *Wechsler v. Orthodox Union,* 2008 U.S. Dist. LEXIS 105780 (2009). Similarly, the EEOC
12  has also determined the OU is a religious organization.  (UMF No. 54.) Those decisions
13  are entitled to great weight by this Court.  (*Shand v. Charles E. Smith Life Cmtys.,* 2019
14  U.S. Dist. LEXIS 16181, *9 (2019)).

15      As all of the above makes clear, the OU constitutes a religious organization for
16  purposes of the ministerial exception. It is precisely because Orthodox Jews "take their
17  religion seriously" and "think that their religion should affect the whole of their lives" that
18  the OU is undoubtedly a religious institution. (*See, e.g., Mitchell v. Helms*, 530 U.S. 793,
19  827-28 (2000) (plurality opinion).

20  **C.    The Ministerial Exception Bars Plaintiff's Claims for Violations of the**
21  **California Labor Code Because Plaintiff's Duties As a *Mashgiach* Were**
    **Religious in Nature, and Integral to the Union of Orthodox Jewish**
22  **Congregation's Religious Mission.**

23      Plaintiff was a religious figure or "minister" within the meaning of the ministerial
24  exception.  In determining whether an employee qualifies as a minister, courts do not look
25  only to a person's title, but instead focus on "**the function performed by persons who**
26  **work for religious bodies**." (*Hosana-Tabor,* 565 U.S. at 198-99) (Alito, J.,
27  concurring.)(emphasis added).  The ministerial exception is not limited to members of the
28  clergy, but includes all workers of a religious institution, whether ordained or not, whose

primary duties were religious in nature.

It is well established that the role of a mashgiach is inherently religious in nature. To become a mashgiach, one must be Jewish, Sabbath-observant (shomer Shabbat), Torah-observant (shomer mitzvot), and personally fulfilling the laws of kashrut (shomer kashrut). (UMF Nos. 14-21; 29-30.)  A mashgiach takes on a great responsibility and burden of the Jewish community by ensuring the integrity of kosher products.  (UMF Nos. 16-17.)  There is no secular rational for Plaintiff's work as a mashgiach.  The winery workers deal with non-kosher grape product and mashgichim only work on kosher items. (UMF No. 17.) Plaintiff himself defined his job of mashgiach as a supervisor of kashruth. (UMF No. 23-26.) The OU views mashgiachim as ambassadors of the Jewish people who provide the religious function of guaranteeing that products with the OU kosher symbol adhere to the kosher requirements of Jewish law. (UMF Nos. 7-20; 23-30.)

### 1.    The Supreme Court's Decision in *Morrisey-Berru* Establishes That Plaintiff was a Minister Within the Meaning of the Ministerial Exception.

In *Hosana-Tabor*, the Supreme Court first identified a non-exclusive list of factors to be considered in determining whether an employee was a "minister" within the meaning of the First Amendment.  These factors included the plaintiff's formal title, the substance reflected in that title, his own use of that title, and the important religious functions he performed for the church.  (*Hosanna-Tabor*, 565 U.S. at p. 192.)  However, the Supreme Court expressly made clear that, by identifying these factors, it was not adopting any sort of "rigid formula." (*Id.* at 190.)

In *Morrisey-Berru*, the Supreme Court confirmed that there was no bright-line or "rigid" test to determine whether a particular position is ministerial, "a variety of factors may be important."  (*Id.* at 2063-64.)  Most important and "[w]hat matters, at bottom, is what an employee does.  And implicit in [the Court's] decision in *Hosana-Tabor* was a recognition that educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." (*Id.* at 2064.)

Here, as a mashgiach, Plaintiff was both a leader (*i.e.*, Head mashgiach) and figurehead of an undeniably religious organization within the meaning of the First Amendment.  (UMF Nos. 1-33; 37-44; 54.)  *Morrisey-Berru* goes on to affirm that the ministerial exception is much broader and more encompassing than that.  Even rank-and-file schoolteachers act as "minister" not only when they lead or provide religious instruction, but when "they were also expected to guide their students, toward the goal of living their lives in accordance with the faith." (*Id.* at 2066.)  Leading by personal example – not just in textbooks, but in "word and deed" – is, thus, one of the most crucial religious functions of the religious mission of a religious school, and likewise any other religious organization, and as such, it is just as important as any specific title or academic subject matter.

While *Morrisey-Berru* confirms that the ministerial exception applies to employees, even when their given title does not include that of "minister, . . .[t]he rule appears to have acquired the label 'ministerial exception' because the individuals involved in pioneering cases were described as 'ministers.'" (*Id.* at 2055,2060.)  In addition, the *Morrisey-Berru* Court held that the exception applies whether or not the minister is a "practicing member of the religion with which the employer is associated." (*Id.* at p. 2068 (internal quotations omitted).)

Because judges cannot be expected to understand or interpret religion, "[a] **<u>religious institution's explanation of the role of such employees in the life of the religion in question is important</u>**." (*Id.* at 2066.)(emphasis supplied.)  Indeed, the majority opinion in *Morrisey-Berru* approvingly cited Justice Thomas' concurrence in *Hosanna-Tabor*, that courts should "defer to a religious organization's good faith understanding of who qualifies as its minister." (*Id.* at 15.)

Here, as explained above, the OU's explanation of the role of the mashgiach as an ambassador of the Orthodox Jewish people, by virtue of his performance of a religious function, is evident. (UMF Nos. 1-33; 36-44.)  As such, even under the original *Hosanna-Tabor* factors, Plaintiff's designation as a mashgiach and outward representation conveyed

that Plaintiff understood and recognized the religious significance of his position. (UMF Nos. 20-30; 36-44.)  Plaintiff's own internal and external correspondence, explanation of his job duties in overseeing the kosher integrity of the product, all were intended to carry out the OU's religious mission. (*Id.*)

Plaintiff was not hired to perform manual labor, but to supervise and ensure that religious principles and tenets were adhered to. (*Id.*)  To the untrained eye it may appear that Plaintiff performed the same work as non-Jewish plant workers at the wineries, but to the trained eye (*i.e.*, followers of the Orthodox Jewish religion), it is clear that the sole purpose of Plaintiff's work as a mashgiach was religious in nature – mashgiachim ensure Jewish religious law is being followed and kosher integrity is maintained.  (UMF Nos. 20-30; 36-44.)  Put simply, there is not a single act that Plaintiff performed that did not have a religious purpose.  If Plaintiff were merely an unreligious plant worker, the OU would not have retained his services.  Plaintiff both understood and took seriously his duty to interweave faith with his duties as a mashgiach. This is evidenced by his reaching out on questions of halakha (Jewish law) to management and poskim (Jewish law experts).  (UMF Nos. 38-39.)

The OU's own perception of the ministerial nature of the mashgiach position should be accorded significant weight in the analysis of whether he was in fact a minister.  The undisputed evidence shows that the OU's understanding of this job was consistent and not concocted simply for the sake of this litigation. (UMF Nos. 1-44; *Wechsler* at 3-4, 6-12.)

Furthermore, all of the OU's administrative decisions alleged in the Complaint were inextricably intertwined with, and cannot be parceled from, the OU's decision to engage Plaintiff as an independent contractor, and not an employee.  The relief Plaintiff seeks is entirely linked to Defendants' hiring decision and compensation determinations.  By bringing this Complaint, Plaintiff asks this Court to improperly probe into Defendants' decisions in that regard.  Such operational and ecclesiastical decisions are plainly protected from judicial encroachment by the ministerial exception.

As such, while Defendants vehemently refute the premise that it misclassified

Plaintiff, or engaged in fraud or negligent misrepresentation, the Court here is precluded from evaluating the basis for, or motivation behind, any of Defendants' actions alleged in the Complaint. The simple fact that the alleged actions touch on the OU's management of a religious figure, or "minister," is alone dispositive in requiring the application of the ministerial exception and preclusion of all Plaintiff's employment claims.

### 2. The Primary Duties of a Mashgiach Are Religious in Nature and Plaintiff Was a Religious Figure Within the Meaning of Ministerial Exception.

Similar to teachers and professors at religious education institutions who are deemed to be "ministers" for purposes of the ministerial exception, as a mashgiach, Plaintiff also had to adhere to and enforce religious Jewish law in order to perform his job. (UMF Nos. 7-44.)   For example, the person deemed a minister in the U.S. Supreme Court's leading case, *Hosana-Tabor*, was a school teacher, whose "religious duties consumed only 45 minutes of each workday." 565 U.S. at 193; *see also Kirby v. Lexington Theological Seminary*, 426 S.W. 3d 597, 601-02, 611-14 (Ky. 2015) (Christian "social ethics" professor fell within the ministerial exception); *Adams v. Indiana Wesleyan Univ.*, 2010 WL 2803077, *9 (N.D. Ind. July 15, 2010)(duties of evangelical Christina university professor were ministerial in nature); *Stately v. Indian Cmty, Sch. of Milwaukee, Inc.,* 351 F. Supp. 2d 858, 869 (E.D. Wis. 2004) (teacher's role was "unquestionably ministerial" because she integrated Native American culture and religion into classes and developed the spiritual life of students); *Shaliehsabou*, 363 F.3d at 309-11 (applying ministerial exception to mashgiach of Jewish nursing home); *Alicea-Hernandez v. Catholic Bishop*, 320 F. 3d 698, 704 (7th Cir. 2003) (press secretary of religious institution determined to be a minister).

Here, the argument for Plaintiff to be deemed a minister is far more compelling than the teacher in *Hosana-Tabor.* While that teacher's religious duties *only* took 45 minutes of the day, the entirety of Plaintiff's job duties were to ensure kosher integrity of the grape product. And keeping kosher is central to religious Jewish life. (UMF Nos. 6-44.)

### 3. Plaintiff Acknowledged And Understood That His Position Existed to Ensure the Kosher Integrity of Grape Products Adhered to the Tenets of the Jewish Faith.

Prior to working for the OU, Plaintiff attended Jewish day school as a youth, worked as a mashgiach for approximately 25 years, and identified as a religiously observant Jew. (UMF Nos. 29-35.)  As explained above, the evidence demonstrates that Plaintiff referred to himself in internal and external correspondence with the OU's clients as the "Head Mashgiach." (UMF No. 26.)  Additionally, like all mashgiachim, the OU required Plaintiff to submit a letter from an Orthodox Rabbi certifying that he was a Sabbath observer. (UMF Nos. 29-30.)  The purpose of the certification was to obtain assurances from an ordained rabbi – and head of a synagogue – that the mashgiachim they hired were trustworthy and fit for the role to carry out the OU's religious mission.  (UMF Nos. 29-30.)

Furthermore, Plaintiff himself wrote emails in which he lays out the foundation of his ministerial duties including: the application of the OU's policies and procedures with respect to the kashruth of grape products; and required consultation with senior management of the OU or the halachic (Jewish law) poskim (experts) when deviations from the OU's kashruth policies arose.  (UMF Nos. 27-28, 37-44.)  While performing work for the OU, Plaintiff was required to understand the specific concepts of Jewish laws of winemaking, and kosher requirements generally, and to report urgent halachic issues to Rabbis Rabinowitz and Kantor. (UMF Nos. 36-44.) Plaintiff would give non-Jewish workers at the wineries instructions regarding how to maintain kosher standards at the facility. (UMF No. 40.)

As such, Plaintiff's personal and professional background establish that he understood and appreciated the religious significance of the role of the mashgiach to people of the Orthodox Jewish religion.

### D. Ninth Circuit Courts Have Held that the Ministerial Exception Exempts Religious Institutions From State Law Based Wage and Hour Claims.

The ministerial exception bars a wide variety of employment law claims, including wage-related claims.  The Ninth Circuit has held that the exception precludes an overtime

---

21       DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

wage claim under state law.  (*See Alcazar v. Corp. of the Catholic Archbishop of Seattle*, 627 F.3d 1288, 1293 (9th Cir. 2010)(en banc)). The Ninth Circuit has also explained that the exception has encompassed "tangible employment action" resulting in "lost or reduced pay." (*Elvig v. Calvin Presbyterian Church* (9th Cir. 2004) 375 F.3d 951, 955, 966.)  ("A tangible employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." (*Id.* at 960-61.)  Moreover, "a minister's working conditions . . . are a part of the minister's employment relationship with the church." (*Werft v. Desert Southwest Annual Conference of the United Methodist Church* (9th Cir. 2004) 377 F.3d 1099, 1103.)

California authority also provides the ministerial exception's scope is broad enough to encompass wage-related claims.  "The [ministerial exception' is about as absolute as a rule of law can be:  The First Amendment guarantees a religious institution the right to decide matters affecting its ministers' employment, free from the scrutiny and second-guessing of the civil courts." (*Henry v. Red Hill Evangelical Lutheran Church of Tustin,* (2011) 201 Cal. App.4th 1041, 1054.)

Here, each of Plaintiff's California Labor Code claims for failure to pay overtime and failure to provide itemized wage statements, is thus barred by the ministerial exception. (*See Alcazar, supra*, 627 F.3d at 1293; *Shaliehsabou*, 363 F.3d at 301.)  This Court should follow the reasoning of other Ninth Circuit cases that are factually analogous to the case at bar and find that the ministerial exception applies.

For example, in *Alcazar v. Corp. of the Catholic Archbishop of Seattle*, 627 F.3d 1288 (9th Cir. 2010)(en banc)[5] the plaintiff, a seminarian, sued a church corporation and a pastor alleging, *inter alia*, violations of Washington's Minimum Wage Act for failure to

---

[5]  This case was preceded by *Alcazar v. Corp. of Catholic Archbishop*, 598 F.3d 668 (9th Cir. 2010) wherein a three-judge panel affirmed the district court's decision applying the ministerial exception.  Additionally, the panel's opinion announced a new test for determining whether a person is a "minister" for purposes of the ministerial exception.  In *Alcazar v. Corp. of the Catholic Archbishop of Seattle*, 627 F.3d 1288 (9th Cir. 2010), the court vacated that opinion and granted rehearing en banc where it adopted the opinion by the three-judge panel in all respects except with respect to adopting a general test for determining a "minister."  Here, Defendants cite language articulated in both cases.

pay overtime wages.  Specifically, the plaintiff sought pay for the overtime hours he worked as a seminarian in a church.  The plaintiff alleged that he was hired to do maintenance of the church, assisted with Mass, and worked many overtime hours for which he was not compensated. The United States District Court for the Western District of Washington dismissed the overtime wage claims on the pleadings based on the "ministerial exception." (*Alcazar*, 598 F.3d at 670.)

On appeal, the appellate court affirmed the district court's ruling that the plaintiff's claim was barred by the Free Exercise Clause and the Establishment Clause of the First Amendment because the ministerial exception applied to the Washington Minimum Wage Act and requiring the church to pay overtime wages would interfere with the church's employment decisions. (*Id.* at 672.)

In reaching its conclusion regarding the applicability of the ministerial exception, the *Alcazar* court explained the interplay between the First Amendment to the United States Constitution's Free Exercise and Establishment Clauses.  The court articulated that these clauses "create an exception to an otherwise fully applicable statute if the statute would interfere with a religious organization's employment decisions regarding its ministers." (*Alcazar v. Corp. of Catholic Archbishop*, 598 F.3d 668, 670 (9th Cir. 2010) *(citing Bollard v. Cal. Province of the Soc'y of Jesus,* 196 F.3d 940, 944, 946047 (9th Cir. 1999).  The court explained that the "ministerial exception" helps to preserve the "wall between church and state" from even the mundane government intrusion. (*Alcazar*, 598 F.3d at 670.) Moreover, the *Alcazar* court explained that its analysis used in applying the ministerial exception in Title VII cases compels the conclusion that the ministerial exception analysis applies to state law-based wage and hour claims as well. (*Alcazar,* 598 F.3d at 672.)

First, the court examined whether Washington's Minimum Wage Act implicates the Free Exercise Clause, which required balancing of the following:

> (1) the magnitude of the statute's impact upon the exercise of religious belief, (2) the existence of a compelling state interest justifying the burden imposed upon the exercise of the religious belief, and (3) the extent to which recognition of an exemption

1
2

from the statute would impede the objectives sought to be advanced by the state.

3
4
5
6
7
8

(*Werft v. Desert Sw. Annual Conference of the United Methodist Church,* 377 F.3d 1099, 1102 (9th Cir. 2004)(per curiam)(quoting *Bollard,* 196 F.3d at 946)).  The *Alcazar* court found that Washington's Minimum Wage Act represented a compelling state interest and, that exempting ministers from the Act would impede Washington's goal of ensuring "minimum standards of employment within the state of Washington." (*Alcazar,* 598 F.3d at 672.)  However, the court determined that:

9
10
11
12
13

> [E]ven in pursuit of a compelling state interest, the balancing test contemplates that some statutes may still have such an adverse impact on religious liberty as to render judicial review of a Church's compliance with the statute a violation of the Free Exercise Clause. The Free Exercise Clause mandates a ministerial exception for religious organizations in such circumstances.

14

(citing *Werft,* 377 F.3d at 1102.)

15
16
17
18
19
20
21

Second, the court examined whether the Washington Minimum Wage Act implicates the Establishment Clause, which required determining the following: (1) whether the statute has a secular legislative purpose, (2) whether "its principal or primary effect advances . . .[] or inhibits religion," and (3) whether it "foster[s] an excessive government entanglement with religion." (*Bollard*, 196 F.3d at 948 (*quoting Lemon v. Kurtzman,* 403 U.S. 602, 612-13, (1971)).  The court determined that although the first two factors were met, the Act presented an entanglement issue.

22
23
24
25
26
27
28

The court explained that, "On a substantive level, applying [a] statute to the clergy-church employment relationship creates a constitutionally impermissible entanglement with religion if the church's freedom to choose its ministers is at stake." (*Bollard*, 196 F.3d at 948-949.)  Additionally, on the procedural level, the very process of civil court inquiry into the clergy church relationship can be sufficient entanglement. (*Id*. at 949.)  "It is not only the conclusions that may be reached by [the court] which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings

and conclusions." (*NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 502 (1979)).

Importantly, the court stated:

> The Religion Clauses compel a ministerial exception from neutral statutory regimes that interfere with the church-clergy employment relationship. Because the ministerial exception is constitutionally compelled, it applies as a matter of law across statutes, both state and federal, that would interfere with the church minister relationship.

(*Alcazar*, 598 F.3d at 673 (citing *Werft*, 377 F.3d at 1100 n.1 ("Because the ministerial exception is based in the First Amendment, we make no distinction between the various federal and state law claims.")))

The facts of *Alcazar* are analogous to the case at bar. Like in *Alcazar*, Plaintiff is a "minister" and pursuing state-based wage and hour claims seeking compensation for unpaid overtime. As explained in *Alcazar*, the First Amendment Religion Clauses compel a ministerial exception to prevent neutral statutory regimes from interfering with the church-clergy employment relationship. This Court should follow the same balancing test used in *Alcazar* to find that forcing the OU, a religious institution, to comply with the California Labor Code would violate the Free Exercise Clause. Additionally, litigating the California Labor Code claims, would lead to excessive government entanglement in violation of the Establishment clause as the Court would infringe upon the OU's ability to make employment related decisions concerning its ministers.

**E.    The Instant Case is Easily Distinguishable from California Cases Denying Application of the Ministerial Exception to Non-Ministerial Employees.**

Defendants recognize that the California Court of Appeal, in the case of *Su v. Stephen S. Wise Temple*, (2019) 32 Cal. App. 5th 1159, , held that the ministerial exception did not apply to preschool teachers at a Jewish synagogue, and permitted the Labor Commissioner to proceed with claims against the synagogue for violation of wage and hour laws. Notably, this decision was issued before the U.S. Supreme Court's recent decision in *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, and therefore to the extent it contradicts

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,* is no longer good law.

Nevertheless, we briefly discuss *Su*. The court analyzed whether the preschool teachers qualified as "ministers" within the meaning of the exception. Although the preschool had a partially religious curriculum, including teaching Jewish holidays, observance of Sabbath, and Jewish values and rituals, significantly, the teachers were not required to be Jewish, were not required to undertake theological study, and some of the current teachers were Catholic. (*Id.* at 1162.) The court of appeal considered whether: (1) the synagogue gave teachers the title of minister or any other religious titles, they are ordained, and if they are required to be Jewish; (2) teachers are required to pass religious instruction or hold religious degrees, (3) teachers held themselves out as ministers, for example by claiming tax benefits that would be available only to ministers, and (4) teachers are responsible for teaching a religious curriculum and have a role in transmitting Jewish religion and practice to the children. (*Id.* at 1168.) Of these factors, only the fourth factor weighed in favor of applying the ministerial exception. Therefore, the court held that teachers were not ministers and the exception did not apply.

The facts at bar are easily distinguishable from the facts in *Su*.[6] First, unlike the teachers in *Su*, Plaintiff held a religious title – "mashgiach" (which can only be held by an observant Jew) – and was recognized as a religious leader by virtue of his role as a supervisor of kashruth. (UMF Nos. 4-30, 36-44.) Second, to serve as a mashgiach, in addition to being an observant Jew, Plaintiff was required to be certified by a rabbi and have Jewish education and training in order to supervise kashruth,[7] which, as pled in

---

[6] *See also Biel v. St. James School* (9th Cir. 2018) 911 F.3d 603 *issued before the U.S. Supreme Court's recent decision in Our Lady of Guadalupe Sch. v. Morrissey-Berru* (Teachers in Catholic schools suing for alleged job discrimination. The district court granted the school's motion to dismiss on the ground the ministerial exception applied to the plaintiffs, and therefore, provided immunity to the schools. The appellate court reversed, holding the teachers were not covered by the exception because neither the teachers nor the schools considered them to be ministers, as reflected in their job titles and duties.)

[7] The term mashgiach is defined as an "inspector appointed by a board of Orthodox rabbis to guard against any violation of the Jewish dietary laws." *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.* 363 F.3d 299, 301 (4th Cir. 2004). Mashgichim must have "knowledge of the basic laws of kashruth" and "must also be a Sabbath observer and be a fully observant Jew. Such persons generally have obtained their knowledge of the laws of kashruth through experience and study at a yeshiva. Mashgichim possess the authority to enforce the laws of kashruth and make on-the-spot decisions based on their knowledge and understanding of the situation at hand. . . complying with kosher dietary laws is an integral and essential part of Jewish identity." *Id.* at 302.

---

26                DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff's Complaint, is the system of Jewish rules that ensures that food products are kosher according to religious regulations. (UMF Nos 4-30, 36-44.)   Third, Plaintiff was held out as a mashgiach and known in this minister-like capacity by the two wineries at which he worked.  *Id.*  Therefore, unlike in *Su,* the factors weigh in favor of finding that Plaintiff, as a mashgiach, was a minister for purposes of applying the ministerial exception. (*See*, *Shaliehsabou*, 363 F.3d at 309.) Thus, Plaintiff should be barred by the ministerial exception from pursuing California Labor Code claims.

### F.    Plaintiff's Causes of Action for Fraud and Negligent Misrepresentation Are Precluded by the Ministerial Exception.

Plaintiff asked to be paid as an independent contractor and the OU continue to classify him as an independent contractor on multiple occasions. (UMF Nos. 45-46.) He furthermore admitted that he did not pay taxes during the years of 2014 to 2018 while working for the OU, nor does he believe in paying taxes. (UMF Nos. 47-48.)  Plaintiff testified that he wrote on social media on or about January 13, 2019 (on Facebook) about the benefits of being a private contractor. (UMF No. 47.) It strains credulity that Plaintiff, who specifically asked to be an independent contractor, somehow was defrauded or misrepresented to about his contractor status.

Furthermore, Plaintiff's causes of action for fraud and negligent misrepresentation seek damages predicated on the California Labor Code claims, which are themselves barred by the ministerial exception.   Because Plaintiff's California Labor Code claims are precluded by the ministerial exception, Plaintiff's fraud and negligent misrepresentation claims must also be barred.  A motion for summary judgment is appropriate as these damages are precluded as a matter of law. (*See, Whittlestone, Inc. v. Handi-Craft, Co.*, 618 F.3d 970, 974 (9th Cir. 2010)).

Essentially, Plaintiff's tort-based claims seek the same relief as the Labor Code claims – general and compensatory damages – and stem from the same facts regarding the OU's employment-related decision making.   Since Plaintiff is barred from pursuing Labor Code claims against the OU, any additional claim seeking recovery of the same underlying

damages is also barred.  (*See, Stambanis v. TWBA Worldwide, Inc.* 2:19-cv-03962-ODW (JEM) U.S. Dist. LEXIS 144058 *24 fn. 4 (C.D. Cal. August 23, 2019). *See also Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 966 (9th Cir. 2004)("Just as the ministerial exception precludes [plaintiff] from alleging Title VII claims, that implicate the Defendants' protected ministerial decisions, it similarly precludes her from seeking remedies that implicate those decisions.")

### G.    Plaintiff's Cause of Action for Unfair Business Practices, Violation of California Business and Professions Code § 17200, et. seq. Is Barred By the Ministerial Exception.

First, Plaintiff's claim for statutory unfair business practices is premised on alleged violations of California Labor Laws and tort laws, which, as explained above, are barred by the ministerial exception.  *See*, *Headley v. Church of Scientology Int'l,* No. CV 09-3987 DSF (FFMx) 2010 U.S. Dist. LEXIS 40533 at *9 fn. 1 (C.D. Cal. April 2, 2010).

 Second, a plaintiff alleging unfair business practices under these statutes must state with reasonable particularity the facts supporting the statutory elements of the violation. (*Silicon Knights v. Crystal Dynamics*, 983 F. Supp. 1303,  (N.D. Cal. Oct. 23, 1997)).

Here, Plaintiff has failed to state any facts to support his claim for statutory unfair business practices, as the claim consists of nothing more than conclusory allegations that Defendants "fail[ed]to pay earned wages" and did so "fraudulently," and that Defendants "[misclassified] plaintiff as an independent contractor." (Compl. ¶ 17.) No other facts are pled in support of this cause of action.  Since Plaintiff's other causes of action fail as a matter of law based on the ministerial exception, there is no underlying basis for the unfair competition claims as alleged against these Defendants.

### H.    The Ministerial Exception Applies to Rabbi Rabinowitz.

The ministerial exception clearly applies to individual defendants.  Courts have held that the ministerial exception insulates from liability the religious organization *as well as the individually named defendant*. (*See e.g. Ross v. Metro. Church of God*, 471 F. Supp. 2d 1306 -1307 and 1312 (ministerial exception barred pastor's 42 U.S.C. section 1981(a) discrimination claim against both the church and the senior pastor, individually.)

1       In *Higgins v. Maher,* 210 Cal.App.3d 1168 (1989), a priest was terminated from his

2   job and attempted to state contract and tort claims against an individual bishop, as well as

3   the Diocese. (*Id*. at 1172-1173.)   The *Higgins* court first rejected the priest's breach of

4   contract claim, finding that it would necessarily involve review of the "church's

5   employment practices" which are recognized as "matters of a singular ecclesiastical

6   concern." (*Higgins*, 210 Cal.App.3d at 1174-1175.)  No breach of contract claim could be

7   stated against either the bishop or Diocese. (*Id.* at 1175.)   The court also rejected each of

8   the plaintiff's tort claims. (*Id.* at 1176.)   Even while recognizing that the plaintiff had

9   adequately pled the elements of "civil" tort claims, the court explained that it could not

10  become involved in what was an ecclesiastical dispute between a priest and his diocese:

11  "When we know that torts such as those of which Higgins complains occurred as

12  inseparable parts of a process of divesture of priestly authority, we are most reluctant to

13  sever them from the privileged aura of what might be called the ecclesiastical exemption."

14  (*Higgins*, 210 Cal.App.3d at 1176.) The ministerial exception barred all claims, both

15  against the individual bishop, as well as the Diocese, who were all participants in the

16  process of terminating the plaintiff. (*Id.*)

17      Other courts have held that the ministerial exception forecloses claims that implicate

18  protected employment decisions by individual defendants of religious institutions.  (*See*

19  *McCants v. Alabama -West Fla. Conf. of the United Methodist Church, Inc.*, No. 08-0686-

20  KD-C, U.S. Dist. LEXIS 45705 (S.D. Ala. May 29, 2009) (holding that an ordained

21  Methodist minister's complaint for race discrimination and retaliation against the United

22  Methodist Church and individually named reverend of the church was barred by the

23  ministerial exception and thus defendants' motion to dismiss was granted.) (*See also Denny*

24  *v. Prince*  68 Va. Cir. 339, 369 (2005) (concluding that the ministerial exception applies to

25  individual defendants.) (*See also McNeil v. Mo. Annual Conf. of the United Methodist*

26  *Church,* 2-10-cv-04154-NKL, 2010 U.S. Dist. LEXIS 98184 (W.D. Mo. September 20,

27  2010)).

28

Here, Defendant Rabbi Rabinowitz is named along with the OU as a defendant in Plaintiff's second cause of action (Unfair Business Practices), third cause of action (fraud and deceit), and fourth cause of action (negligent misrepresentation). As the ministerial exception insulates the OU from those causes of action, it also insulates Rabbi Rabinowitz, the Senior Rabbinic Coordinator, for his participation in the employment-related actions.

## IV.   CONCLUSION

For all the above reasons, Defendants respectfully request that the Court grant this motion for summary judgment, or in the alternative, partial summary judgment.


DATED:  September 30, 2022          JACKSON LEWIS P.C.



By:     /s/ *Leonora M. Schloss*
        Leonora M. Schloss
        Sevada Hakopian

        Attorneys for Defendants
        UNION OF ORTHODOX JEWISH
        CONGREGATIONS OF AMERICA AND
        NACHUM RABINOWITZ

1

4871-9321-9085, v. 6

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28