Steven R. Friedman, Esq (SBN 100748)
Michael E. Friedman, Esq. (SBN 291694)
LegalSolutionsEmail@gmail.com
Law Office of Steven R. Friedman
1880 Century Park East,  Suite 1411
Los Angeles, CA   90067
310 273-2505

Attorneys for Plaintiff
YAAKOV MARKEL

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YAAKOV MARKEL; | **Case No:    2:19-cv-10704-JWH-SK** |
| Plaintiffs, | [Assigned for all purposes to Judge John W. Holcomb] |
| vs. | **PLAINTIFF YAAKOV MARKEL'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT.** |
| UNION OF ORTHODOX JEWISH CONGREGATIONS OF AMERICA, a Corporation; NACHUM RABINOWITZ, an individual; DOES 1 - 100, | HRD DATE: October 28, 2022 TIME:9:00am DIV: 9D - 9th Floor |
| Defendants. | [Filed Concurrently With Objection to Request for Judicial Notice] |
| | Current Trial Date:   February 6, 2023 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLAINTIFF YAAKOV MARKEL HEREBY SUBMITS THE FOLLOWING

OPPOSITION TO DEFENDANTS'  MOTION FOR SUMMARY JUDGEMENT:

Plaintiff relies upon the Joint Exhibits A-E which include Plaintiff's evidence.

1

1

2

**TABLE OF CONTENTS**

3

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . 6

4

5

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

6

7

I. SUMMARY OF THE MANY DISPUTED MATERIAL FACTS. . . . . . . . . . . . . . . . 8

8

9

II.  LEGAL STANDARD FOR SUMMARY JUDGMENT.. . . . . . . . . . . . . . . . . . . . . 10

10

11

III.  LEGAL STANDARD FOR THE APPLICABILITY OF THE AFFIRMATIVE

12

DEFENSE OF MINISTERIAL EXCEPTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

13

14

15

IV.  THE SUPREME COURT'S EXPLANATION OF THE REASONING BEHIND

16

THE MINISTERIAL EXCEPTION MAKES CLEAR THAT THE MINISTERIAL

17

DOES NOT APPLY HERE TO A FAILURE TO PAY AN EMPLOYEE WHO

18

QUIT FOR HOURS ACTUALLY WORKED. INSTEAD, THE EXCEPTION

19

APPLIES ONLY TO CLAIMS REGARDING THE HIRING, SUPERVISION,

20

TRAINING OR RETENTION OF A MINISTER AT A RELIGIOUS

21

ORGANIZATION, SUCH AS DISCRIMINATION OR RETALIATION CLAIMS

22

BY A MINISTER WHO WAS TERMINATED . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

23

24

V.  DEFENDANT OU IS NOT A RELIGIOUS INSTITUTION AND IS INSTEAD A

25

BUSINESS LICENSING ITS TRADEMARK FOR A FEE.   . . . . . . . . . . . . . 20

26

A.  The OU Has Stated in Other Courts and in Order to Receive $10 Million of

27

Federal Funds That Its Business of Kosher Certification Is Not Religious

28

Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

B. The OU Received $10 Million of Federal Loan Forgiveness by Representing to
   the SBA that the OU Was "Most Aptly" Classified as a Food Service
   Contractor Instead of A Religious Organization. . . . . . . . . . . . . . . . . . . . . 22

C.  Defendants' Testimony in this Case Tacitly Admitted That the Kosher
   Certification Is Not a Religious Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

D. Defendants Incorrectly Rely Upon *Conlon*, and *Schmoll.* . . . . . . . . . . . . . . . 24

E.  Defendant Has Not Identified How or Why the Amount Paid to Plaintiff Is a
   Religious Decision. ***Alcazar* Is Completely Inapplicable to the OU.** . . . . 25

F.  Other Cases Discussing Religious Entities Show the OU is a Business.. . . . . . 27

VI.  PLAINTIFF IS NOT A MINISTER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

VII.  PLAINTIFF'S CLAIMS FOR FRAUD, UNLAWFUL BUSINESS PRACTICES,
    AND CLAIMS AGAINST RABINOWITZ ARE NOT PRECLUDED BY THE
    MINISTERIAL EXCEPTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Case No. 2:19-cv-10704-JWH-SK          PLAINTIFF'S OPP TO MOT SUM JUDGMENT.

# TABLE OF AUTHORITIES

## CASES

*Alcazar v. Corporation of the Catholic Archbishop of Seattle* (9th Cir. 2010)
627 F.3d 1288. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 26, 27, 28

*Celotex Corporation v. Catrett,* 477 U.S. 317 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Cornwell v. Electra Central Credit Union,* 439 F.3d 1018 . . . . . . . . . . . . . . . . . . . . . . 11

*Defendants cite Conlon v. InterVarsity Christian Fellowship,* 777 F.3d 829 . . . . . . . . . 25

*Hosanna-Tabor Evangelical Lutheran Church and Schools v.*
*E.E.O.C.,* 565 U.S. 171  . . . . . . . . . . . . . . . . . . . . 12, 13, 15, 16, 17, 18, 19, 20, 28,
29, 30

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America,* 344
U.S. 94 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*McClure v. Salvation Army,* 460 F.2d 553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Our Lady of Guadalupe Schools v. Morrissey-Berru,* 207 L. Ed. 2d
870 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 15, 18, 19, 20, 23, 25,
28, 29

*Paz v. Wauconda Healthcare and Rehabilitation Ctr., LLC,* 464 F.3d 659 . . . . . . . . . . 11

*Schmoll v. Chapman Univ.,* 70 Cal. App. 4th 1434 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Shaliehsabou v. Hebrew Home of Greater Washington, Incorporated,* 363 F.3d 299 19, 20

*Spencer v. World Vision, Incorporated,* 633 F.3d 723 . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Sumner v. Simpson Univ.,* 27 Cal. App. 5th . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Waldridge v. American Hoechst Corp.,* 24 F.3d 918 . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Yeager v. Bowlin,* 693 F.3d 1076 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**STATUTES**

42 U.S.C. § 2000e et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Case No. 2:19-cv-10704-JWH-SK          PLAINTIFF'S OPP TO MOT SUM JUDGMENT.

1

2

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

3

4

5

Defendants' Motion for Summary Judgment must be denied in its entirety because the evidence shows that there are substantial and numerous material facts in dispute regarding each element of Defendants' "ministerial exception" affirmative defense.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

Plaintiff disputes Defendant Union of Orthodox Jewish Congregations of America's ("OU") argument that OU is a religious organization.  The evidence shows OU is not a religious organization and therefore cannot invoke the ministerial exception. OU is a large business with more than $130 million of annual income derived almost exclusively from licensing its trademark for use as a marketing tool on all sorts of products, including many which are unrelated to food, including jewelry cleaning machines, floor sealer, jeweler's gloves,  garage and floor cleaner, chandelier cleaner, laundry detergent, whiteout, and other non-food items. Joint Exhibit, Part E, pages 367, 376-378, 380-383[1]. The OU uses this money to pay its C-Level employees high six figure salaries. J.E. Part E p. 488. The OU demands large payments to use its trademark, frequently sues to enforce their trademark in Federal Court, and states that it cannot provide its trademark without the fee. J.E. Part E, p. 408, 464.  The OU also testified in this matter that it does not subsidize the licensing of its trademark or kosher certification because "it's not good business to subsidize kosher certification" (J.E. Part E p. 637:3-7).

21

22

23

24

25

26

The OU recently received $10 million of forgiveness of its Federal SBA Paycheck Protection Program (PPP) loan based upon the under declaration of its CFO that the OU is "most aptly" categorized as a "Food Service Contractors" NOT a "Religious Organization" under the North American Industry Classification System (NAICS) used by the Federal Government and Census Bureau.  (J.E., Part D page 183).  It is also

27

28

[1] The Joint Exhibit is referenced throughout as "J.E." followed by the Part and the page number.  Where a paragraph or line number is available it is cited.

Case No. 2:19-cv-10704-JWH-SK           PLAINTIFF'S OPP TO MOT SUM JUDGMENT.

disputed that the act of kosher supervision and kosher certification is a "religious act" which would qualify the OU to be a religious organization. Whether Defendants and Plaintiff were engaged in a religious act is part of any analysis of whether the Plaintiff is a "minister." On this, and other key matters, Defendant OU appears before this Court blowing hot and cold.

The OU's court filings in other Federal Courts contradict the OU's current position and confirm the Plaintiff's position that his work at the factory was not religious in nature.  The OU previously told the Eastern District Court of New York that **kosher food production and labeling "is not a religious exercise,**" (J.E., Part E, page 302 ¶13, page 345) that ""**Kosher food, in and of itself, has no religious significance**." that "Food that is 'kosher' is merely food that is fit or proper for consumption according to Jewish dietary laws.   That certain foods are designated as 'kosher' does not signify or imply that they have received a special blessing." (J.E., Part E, page 302 ¶¶14-16, page 345) and that "**'kashruth' describe[s] the physical characteristics of foods** . . . **the dietary standards are** absolutely clear, entirely undisputed, and **remarkably mundane**. . . **In no event does the determination depend on any spiritual factor**"  J.E., Part E, page 302 ¶13-16, page 324-325 [highlighted] bold added).  This contradicts the OU's arguments before this Court in the instant summary judgment motion.

Moreover, even if Defendant OU was a religious organization, the factual disputes preclude any finding at this stage that Plaintiff would qualify as a minister. Plaintiff testified he has no rabbinic ordination, did not engage in any religious activity, had no discretion to make or set policy, did not teach or preach Judaism to anyone, was never being educated or taught by the OU, never acted as an "ambassador" to any Jewish or Non-Jewish community, failed to even make it half way through Jewish high school, was never interviewed or screened for his job at the OU, and engaged in non-religious business tasks as an employee of the OU being paid by the hour to work at a factory moving pipes, cleaning industrial tanks, sign bills of lading, operating a food press, and

working for 48 hours straight to do it because the OU was saving money and didn't hire additional staff. The Defendants' dispute all of these facts and the evidentiary dispute, in and of itself, precludes the granting of any part of this motion because the Court cannot determine whether Plaintiff was or was not a minister without weighing the evidence, which is the province of the trier of fact at trial.

Finally, the law is clear, that even if Defendant OU was a religious organization and even if Plaintiff was a minister, the "ministerial exception" is not a defense to Plaintiff's claim that the OU refused to pay him for many days which he worked and that the OU also refused to pay him overtime and double time as required by California law.

Nearly every material fact regarding Defendants' affirmative defense is disputed by Plaintiff's testimony and evidence.  The matter should not be resolved upon summary judgment and must instead proceed to trial.

## I. SUMMARY OF THE MANY DISPUTED MATERIAL FACTS.

Defendants' motion is restricted to the ministerial exception, and Plaintiff therefore restricts his arguments to this same issue.  This case arises out of a claim by Plaintiff Markel that the OU did not pay him at all for many of the hours that he worked for the OU, and that the OU did not pay him the correct overtime when he worked for 24 or 48 hours straight. Plaintiff worked at a factory processing food, cleaning vats and hoses, The OU claims that it need not pay Plaintiff anything because the OU claims to be a religious institution and claims that Plaintiff is a minister.  But these material facts are all disputed and Defendants' legal analysis is incorrect.

Plaintiff claims Defendant OU is not a religious institution and is instead a business.  To support this claim, Plaintiff offers the following evidence: 1.  OU's CFO's own testimony to the Federal Government that the OU is "most aptly" described as a Food Service Contractor, rather than a Religious Entity (J.E., Part D page 183); 2.  OU's filings in other Federal Cases that kosher certification is not a religious act(J.E. Part E, p. 302 ¶¶14-16, p. 345) 3. The OU's testimony that its business pitch to potential clients is

that the OU trademark is a marketing tool.  J.E. Part E pages 694:21-696:10); 4. The OU's statements to the State of New York that it generates $130 million in revenue annually and pays its top employees high six figure salaries. (J.E. Part D p. 182-184, Part E p. 488); 5.  Defendants' deposition testimony that they do not engage in a public service or subsidize kosher certification because "it's not good business to subsidize kosher certification" (J.E., Part E page 637 lines 3-7); 6. Defendants compete against other for profit non-religious entities for the same clients and business. (J.E. Part E, Page 373 ¶51).  Defendants dispute these facts and argue the OU is a religious institution based upon its original charter, some of the charities to which it donates, and its argument that kosher certification in food production is a religious act..

Both parties agree that Plaintiff was not a Rabbi, that Plaintiff was not receiving any training from the OU, was not participating in any sort of seminary or religious ordination program, and that the OU does not offer any such ordination programs.  (J.E. Part E p. 362 ¶¶5-6; p. 369-370 ¶¶33-38). Plaintiff's testimony is that there was no interview or screening process to ensure that he, or the other kosher supervisors "followed the Torah" in their daily lives or were knowledgeable about the kosher laws or technical requirements. (J.E. Part E. P.368 ¶27). Defendants dispute this and say that they did require kosher supervisors to follow the Torah in their daily lives. (Fact 19).

Plaintiff and others at Delano testified he was never a teacher, preacher, or ambassador of the Jewish people, and never preached any form of religion or taught anyone about religion on behalf of the OU. (J.E. Part E p. 370¶¶35-37; p. 358 ¶¶9-10, 359 ¶13). Plaintiff further testified the OU never asked him to engage in any of this conduct and that he was never told anything of the sort.  Third party non-Jewish shift supervisors at the factory where Plaintiff worked also testified that Plaintiff never taught or preached Judaism to anyone at the factory. (J.E. Part E p. 358 ¶¶9-10, 359 ¶13) Defendants partially dispute this and claim that **in general**, they sometimes want kosher supervisor's to be "ambassadors of the Jewish people" but they never stated Plaintiff was

such an "ambassador.  Plaintiff disputes that the OU has any ability or authority to represent "the Jewish People" or appoint "ambassadors" and contends this off the cuff statement at a deposition is contradicted by the OU's actual statements to kosher supervisors. J.E. p. 369 ¶¶33-35.

Plaintiff contends that his job did not involve any religious duties.  Plaintiff was responsible for factory work, including sanitizing large drums, signing bills of lading, crushing grapes, moving hoses, reconstituting juice concentrate, sealing drums and vats. This work was food services work, not religious work J.E. 358 ¶8.  Third parties who worked at the plant also confirm that Markel's duties were identical to the duties of the non-Jewish factory workers, with the only distinction being that Markel was an employee of the OU and the other workers were employed by Delano. J.E. 358 ¶8.  The OU disputes this and argues generally that the OU's kosher supervision and certification is purely a religious act and somehow different from the other factory workers doing the same job.  Notably, the OU does not discuss what specific acts carried out by Markel were religious.  Indeed, the OU's evidence doesn't describe anything about what Markel's daily work life involved because it was mundane, non-religious acts.

Markel never led any prayers, never received ordination, never taught any classes, and never took any classes or received any education from the OU.

Plaintiff was never a teacher, was never charged with explaining any part of judaism.  Instead, he would get a checklist from the OU of policies which must be followed and events which could not occur and had to follow that list to the letter.  If a question arose, Plaintiff would have to receive further instructions from the OU, he had no authority to make his own decision and no discretion to deviate from the OU checklist.  OU disputes these facts.  Ultimately, Plaintiff resigned from his position in March 2018.  (J.E. Part E Page 372 ¶45).

## II.  LEGAL STANDARD FOR SUMMARY JUDGMENT.

Under FRCP Rule 56, the moving party bears the burden of showing "that there is

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP Rule 56(a).

The burden upon a plaintiff opposing summary judgment is low: "The burden on the non-movant is not onerous. [citation] She need not tender evidence in a form that would be admissible at trial; she may rely on affidavits or any other materials of the kind identified in Rule 56(c). *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Moreover, the non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, **she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact**." *Waldridge v. Am. Hoechst Corp*., 24 F.3d 918, 920–21 (7th Cir. 1994) (bold added).

Moreover, evidence in the form of declarations are admissible to defeat summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) citing FRCP Rule 56(c). The parties may also submit self-serving declarations and testimony in opposition to summary judgment. *Paz v. Wauconda Healthcare & Rehab. Ctr., LLC,* 464 F.3d 659, 664 (7th Cir. 2006); *Yeager v. Bowlin,* 693 F.3d 1076, 1080 (9th Cir. 2012). Summary judgment is properly denied even where the evidence is circumstantial rather than direct. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1029 (9th Cir. 2006).

Here, Plaintiff has provided admissible clear evidence in the form of testimony, depositions, declarations and authenticated documents which demonstrate that the material issues in this case are all disputed and therefore summary judgment should be denied.

## III.  LEGAL STANDARD FOR THE APPLICABILITY OF THE AFFIRMATIVE DEFENSE OF MINISTERIAL EXCEPTION.

Defendants' entire notice and motion are based exclusively upon the argument that the ministerial exception bars every single one of Plaintiff's claims. Plaintiff's evidence, briefing and authority is therefore focused on the single issue noticed by Defendants.

The ministerial exception acts as an affirmative defense. "We conclude that the exception operates as an affirmative defense" *Hosanna-Tabor Evangelical Lutheran*

*Church & Sch. v. E.E.O.C.,* 565 U.S. 171, 195, FN 4 132 S. Ct. 694, 709, 181 L. Ed. 2d 650 (2012). Omitted from Defendants' moving papers, is the law that **the application of the ministerial exception requires a fact intensive analysis of each individual case**, and Defendants' attempt to conflate the case law regarding the application of the ministerial exception is incorrect:

> "**The Supreme Court has made clear, in both *Hosanna-Tabor* and *Our Lady*, that this threshold determination of whether an employee is a 'minister' for purposes of the 'ministerial exception' requires a fact-intensive inquiry into the specific circumstances of a given case**. See *Our Lady*, 140 S. Ct. at 2067 ('call[ing] on courts to take all relevant circumstances into account and to determine whether each particular position implicated the fundamental purpose of the exception'); see also id. at 2063 (stating that, '[i]n determining whether a particular position falls within the Hosanna-Tabor exception, a variety of factors may be important.'); id. at 2066 (noting that in *Our Lady* '[t]here is abundant record evidence that [the plaintiffs-employees] both performed vital religious duties,' discussing that evidence at length); *Hosanna-Tabor*, 565 U.S. at 190–94, 132 S.Ct. 694 (considering, in significant detail, 'all the circumstances of [the employee's] employment')."

*Tucker v. Faith Bible Chapel Int'l,* 36 F.4th 1021, 1029 (10th Cir. 2022) (bold added).

"We are reluctant, however, to adopt a rigid formula for deciding when an employee qualifies as a minister." *Hosanna-Tabor* at 190. "We declined 'to adopt a rigid formula for deciding when an employee qualifies as a minister,' . . . We identified four relevant circumstances but did not highlight any as essential." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 207 L. Ed. 2d 870, 140 S. Ct. 2049, 2062 (2020) discussing *Hosanna-Tabor*.

Therefore, as discussed in more depth below, the rigid application of the

Case No. 2:19-cv-10704-JWH-SK          PLAINTIFF'S OPP TO MOT SUM JUDGMENT.

ministerial exception proposed by the Defendants is incorrect.  Instead, all of the factors considered by *Hosanna-Tabor* favor Plaintiff not being a minister. Markel was never a Rabbi, had no formal title, did not have religious knowledge or training and did not receive any from the OU.  Markel never claimed to be a Rabbi and was not at all involved in teaching, preaching, or interpreting a religious message to anyone. (J.E. Part E p. 362 ¶¶5-6; p. 369-370 ¶¶33-38). At a minimum, the facts which underlie any determination on this issue are disputed and must be resolved at trial.

Moreover, the legal reasoning behind the recognition of the ministerial exception by the Supreme Court in *Hosanna-Tabor* and *Morrissey-Berru* demonstrates that ministerial exception is inapplicable to the claims brought by Plaintiff because they do not relate to the selection, supervision or retention of Markel by the OU.

**IV.  THE SUPREME COURT'S EXPLANATION OF THE REASONING BEHIND THE MINISTERIAL EXCEPTION MAKES CLEAR THAT THE MINISTERIAL DOES NOT APPLY HERE TO A FAILURE TO PAY AN EMPLOYEE WHO QUIT FOR HOURS ACTUALLY WORKED. INSTEAD, THE EXCEPTION APPLIES ONLY TO CLAIMS REGARDING THE HIRING, SUPERVISION, TRAINING OR RETENTION OF A MINISTER AT A RELIGIOUS ORGANIZATION, SUCH AS DISCRIMINATION OR RETALIATION CLAIMS BY A MINISTER WHO WAS TERMINATED.**

The "ministerial exception" does not act as a bar to every single wrong committed by a religious institution against its employee.  Instead, it is an affirmative defense which is rationally limited to those disputes between a religious institution and its minister employee which impact the religious institution's hiring, firing, or retention of those ministers who might pervert their doctrine in some way.

"The independence of religious institutions **in matters of 'faith and doctrine'** is closely linked to independence in what we have termed 'matters of church government.' [citation] **This does not mean that religious institutions enjoy a general immunity from secular laws**, but it does protect their autonomy **with respect to** *internal management decisions that are essential to the institution's central mission*. And **a component of this autonomy is the selection of the individuals who play**

**certain key roles**. The "ministerial exception" was based on this insight. Under this rule, courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions. The rule appears to have acquired the label "ministerial exception" because the individuals involved in pioneering cases were described as "ministers. . . . **But it is instructive to consider why a church's independence on matters 'of faith and doctrine' requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities. Without that power, a wayward minister's preaching, teaching, and counseling could contradict the church's tenets and lead the congregation away from the faith**. **The ministerial exception was recognized to preserve a church's independent authority *in such matters*.**"

*Morrissey-Berru* 140 S.Ct. 2049, 2060–2061 (emphasis added).

The use of the phrase "in such matters" by the Supreme Court is referencing the religious institution's "authority to select, supervise, and if necessary, remove a minister without interference by secular authorities." Plaintiff's claim does not relate to retaliation, or wrongful termination, or some sort of discriminatory act by the OU while Plaintiff was employed by the OU. Indeed, Plaintiff testified (and Defendants concede) that Plaintiff resigned from his work at the OU and was not fired or terminated by the OU. See Additional Genuine Disputed Facts Proffered by Plaintiff, Fact #2. (J.E. Part E Page 372 ¶45; J.E. Part E Pages 697-700.)

*Morrissey-Berru* and *Hosanna-Tabor* both discussed the background and reasoning behind the recognition of the ministerial exception. The entire discussion focused exclusively on the autonomy of religious institutions to choose their religious leaders so that the religious institution can control the way its religion is preached, taught and interpreted and so that the government is not involved in dictating the path of a

---

religion's future.

"Both Religion Clauses [the Establishment Clause and the Free Exercise Clause of the First Amendment] bar the government from interfering with the decision of a religious group *to fire one of its ministers*.  Controversy between church and state over religious offices is hardly new. . . Seeking to escape the control of the national church, the Puritans fled to New England, where they hoped to elect their own ministers and establish their own modes of worship. . . .William Penn, the Quaker proprietor of what would eventually become Pennsylvania and Delaware, also sought independence from the Church of England. . . Colonists in the South, . . . chafed at the control exercised by the Crown and its representatives over religious offices. . . Controversies over the selection of ministers also arose in other Colonies with Anglican establishments, including North Carolina. . . **It was against this background that the First Amendment was adopted. Familiar with life under the established Church of England, the founding generation sought to foreclose the possibility of a national church.** . . . the **Religion Clauses ensured that the new Federal Government**— unlike the English Crown— **would have no role in filling ecclesiastical offices**. The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own."  *Hosanna-Tabor* 565 U.S. 171, 182-184 (emphasis added).

The Supreme Court in *Hosanna-Tabor* then went on to cite cases in which the Supreme Court issued decisions preventing the state from interfering in "matters of church government as well as those of faith and doctrine." to protect "the '[**f]reedom to select** the clergy, where no improper methods of choice are proven," *Hosanna-Tabor* at 181, 186 (bold added) citing *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 116 (1952)

*Hosanna-Tabor* made clear the issue protected by the ministerial exception was a

15

**religious organization's freedom to select its ministers**:

> "Until today, we have not had occasion to consider whether **this freedom of a religious organization _to select its ministers_ is implicated by a suit** alleging discrimination in employment. . . . **Since the passage of Title VII** of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., **and other employment discrimination laws, the Courts of Appeals have uniformly recognized the existence of a "ministerial exception,"** grounded in the First Amendment, **that precludes application _of such legislation_ to claims concerning the employment relationship between a religious institution and its ministers**.  We agree that there is such a ministerial exception. . . . . **Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs**. _By imposing an unwanted minister_, **the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the _power to determine which individuals will minister to the faithful_ also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.**"  _Hosanna-Tabor_ at 188–89 (emphasis added).

Given the Supreme Court's lengthy discussion of the underlying basis for the recognition of the ministerial exception as an outgrowth of the First Amendment, the application of the ministerial exception is clear.  **The ministerial exception acts as an affirmative defense only where the claim presented is one which impacts a religious institution's ability to select, hire, fire, or discipline its ministers**.  Plaintiff's claims,

1  which focus on being paid for the hourly work he performed, and being paid overtime

2  for those hours worked beyond 12 hours, is not a claim which triggers the application of

3  the ministerial exception defense.

4      "**the [ministerial] exception also applies more narrowly only to *employment***

5  ***discrimination claims*** asserted by a <u>minister</u>." *Tucker v. Faith Bible* at 1029 (10th Cir.

6  2022) (emphasis added).  Therefore, the ministerial exception cannot be applied here,

7  since there is no employment discrimination claim of any kind.

8      Indeed, a review of every single case cited by Defendants demonstrates that the

9  common thread which triggered the application of the ministerial exception is a plaintiff

10  who seeks a judicial decision which would impact the religious institution's ability to

11  select, hire, fire, discipline, or train its ministers.  Plaintiff's complaint seeks no such

12  judicial decision and instead merely requires the Court to determine whether Plaintiff

13  worked the hours he claimed to have worked, and whether he was paid at all, or paid the

14  correct amount, for those hours.  The ministerial exception does not apply here.

15

16      **A. The Ministerial Exception Applied in the Cases Cited by Defendants**
   **Because in Each Case the Plaintiff Was Seeking to Involve the Court in a Decision**

17  **about the Religious Institution's Ability to Select, Hire, Fire, Discipline or Train its**
   **Ministers.  Plaintiff's Claims Do Not Implicate this Type of Relief.**

   None of Defendants' authority expands the ministerial exception to claims

18  presented by the Plaintiff and this Court should not be the first to expand the ministerial

19  exception to apply to these facts.  Each case is addressed below.

20

21      *Hosanna-Tabor* involved the an Evangelical Lutheran Church and School and

22  their employee Perich (an admitted commissioned minister) who, among other things,

23  "taught a religion class four days a week, led the students in prayer and devotional

24  exercises each day, and attended a weekly school-wide chapel service. Perich led the

25  chapel service herself about twice a year." *Id.* at 178.  Perich was later fired when she

26  threatened to sue. *Id.* at 178.  Perich sued, alleging discriminatory and retaliatory

27  termination based upon her disability and threat to sue.  The church responded that "she

28  had been fired for a religious reason - namely, that her threat to sue the Church violated

---

the Synod's belief that Christians should resolve their disputes internally." *Id.* at 180. The Court applied the ministerial exception because the case involved "a church's selection of its ministers" and "concerns government interference with an internal church decision that affects the faith and mission of the church itself" *Id.* at 190.  Here, Plaintiff was not fired, and instead resigned.  The issue here whether the OU agreed to pay for Plaintiff's work and then did not, which does not implicate an internal religious decision affecting the faith and mission of a religious institution.

*Morrissey-Berru,* similarly involved two teachers. Both teachers were similarly situated and conceded they taught subjects, including religion at a "Roman Catholic primary school in the Archdiocese of Los Angeles" "took religious education courses at the school's request," "was expected to attend faculty prayer services," stated in writing their mission was to "to develop and promote a Catholic School Faith Community," was "responsible for the faith formation of the students in their charge each day," and prayed with her students and testified that she tried to teach "catholic values" *Morrissey-Berru* at 2056-2057, *Id.* at 2059.  **Both teachers filed *wrongful termination claims*. In both cases, the employer alleged that the employee teacher was fired for failing to teach the religious curriculum in conformity with church doctrine**.  *Id.* at 2059.  The parties conceded their employers were religious organizations and the Court applied the ministerial exception because "when a school with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith, judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow."  *Id.* at 2069. Therefore, the issue in *Morrissey-Berru* clearly implicated the application of a church doctrine to its employee's.  Here, Defendant OU is not a teacher or school, and Plaintiff is not a rabbi and never did any teaching of any kind, never took any classes from the OU to obtain ordination, and did not interpret or preach a religion on behalf of the OU. J.E. Part E, page 362 ¶¶4-7; 369-370 ¶¶33-38.  Additionally, as mentioned above,

1    Plaintiff resigned and was not fired and his claims do not sound in wrongful termination.

2        In *Alcazar v. Corporation of the Catholic Archbishop of Seattle* (9th Cir. 2010)

3    627 F.3d 1288 (discussed at length below) limited its holding to prevent courts from

4    determining whether or how much, a priest in training was to be paid by the church for

5    work that was performed *as part of his seminary training to become a priest* involved

6    religion and implicated the "ministerial exception." *Alcazar* at 1290-1292.

7        *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299, 308

8    (4th Cir. 2004) preceded *Hosanna-Tabor* and *Morrissey-Berru* and is no longer

9    controlling law.  However, even in that case the employee claimed to be a member of the

10   clergy, was vested with substantial discretion to make religious decisions, was selected,

11   prequalified, and disciplined by a Rabbinical Assembly in order to work at the *Hebrew*

12   *Home* whose entire goal was to provide a Jewish religious life to the Jewish residents

13   *who resided at the home*, including daily prayer conducted by a Rabbi, community

14   education, and meals which complied with jewish dietary restrictions.  *Shaliehsabou v.*

15   *Hebrew Home* at 301.  **The *Hebrew Home* essentially operated as a live-in synagogue**

16   and its employee's core function was to create and enhance the jewish religious

17   experience of his employer's residents and therefore the ministerial exception applied.

18

19       *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972) is superceded by

20   *Hosanna-Tabor* and *Morrissey-Berru* and also involved an admitted minister who

21   underwent two years of religious training and oversaw the execution of the Salvation

22   Army's religious projects.  *Id* at 554-555.  All parties agreed the employer was a religion

23   and the employee was a minister engaged in religious activity.  *Id*. at 556. The minister

24   was then fired and sued alleging ***wrongful termination based upon her gender***, and

25   "sought reinstatement, an injunction against further discriminatory practices, and a

26   judgment for the alleged deficiency in compensation paid to her as compared to male

27   Salvation Army officers."  *Id* at 555.  The Circuit Court, dismissed her suit because her

28   claims "cause the State to intrude upon matters of church administration and government

which have so many times before been proclaimed to be matters of a singular ecclesiastical concern." *Id*. at 560.  Contrary to Defendants' argument, the issue of the amount of pay was only a small portion of the claim, and it, together with all the other relief sought, required an analysis of the application of the religion by the employer.  By contrast, Plaintiff's claim is not for the Court to compare his salary to another person's but instead to be paid for the hours worked.  Nor is the OU making a claim that the amount paid to Plaintiff somehow involved a religious decision.  In fact, there is not a shred of evidence to even link the Plaintiff's amount or rate of pay to any religious issue of any kind.  Thereby precluding the application of the ministerial exception.

Defendants' motion asks the Court to make new law and expand the ministerial exception far beyond its current form and in a way which contradicts the historical contexts of its creation.  Plaintiff's claims do not implicate any religious decision.  The trial in this matter need only answer whether Plaintiff worked the hours he claims (he did), whether the OU agreed or was obligated to pay him for those hours (they are so obligated) and whether Markel was paid (he was not).  None of these decisions implicate the autonomy of a religious institution and the ministerial exception is inapplicable.

## V. DEFENDANT OU IS NOT A RELIGIOUS INSTITUTION AND IS INSTEAD A BUSINESS LICENSING ITS TRADEMARK FOR A FEE.

Defendant OU argues that it is a religious institution, which is a prerequisite to the application of the ministerial exception. However, this fact is disputed by the OU's own prior statements as well as other substantial evidence..

**The OU's primary business, the place where it devotes the majority of its resources, and the work which generates nearly all of the OU's income is the licensing of the OU's trademark in exchange for a fee.** J.E., Part E, pages 656-657 (Deposition p.260:17-261:2); J.E. Part E Page 562.

The OU is part of a $12 billion a year industry of kosher certification and trademark licensing for a fee (J.E., Part E page 628 Deposition of OU's PMQ Rabinowitz, Volume 1 p. 49:15-25).  It generates $135 million annually from its

business.  (J.E., Part E pages 488 and 564).  In order to do this, **the OU competes against many other for profit kosher certification entities for the same clients**.  J.E. , Part E, Page 373 ¶51.

OU argues it is providing a community service to some jews by making sure that kosher food is certified as such.  This fact is disputed.  The OU is not providing a community service, and in fact refuses to cut into its profits to subsidize its expensive kosher certification fee. Defendant testified they must turn a profit and "it's not good business to subsidize kosher certification" and so they do not do it. J.E., Part E   page 637 lines 3-7.  Similarly, the OU sues in Federal Court anytime their trademark is used without the OU receiving a fee, even if the OU agrees the food is kosher. J.E. Part E pages 408, 464, 371 ¶42. There, the OU stated "the OU 'simply cannot permit ... use [of] the OU mark ... without paying for the service. ... The Orthodox Union cannot provide certification services gratuitously'" J.E. Part E pages 408, 464.

The OU is a business.  Whether or not it gives to charity is immaterial.  Instead, the OU's primary purpose and business is the licensing of its mark for kosher certification, something which the OU has told other Courts is not a religious act, making their status as a "religious institution" a disputed fact.  This conduct also calls into question and renders disputed the propriety of the OU's status as a non-profit.

**A.  The OU Has Stated in Other Courts and in Order to Receive $10 Million of Federal Funds That Its Business of Kosher Certification Is Not Religious Act**.

In addition to the OU being a business, the OU has conceded in other filings that the act of kosher certification and supervision, which is its primary business and source of its income, is NOT a religious act.  In a federal case in New York, the OU filed a motion arguing that kosher certification and supervision is not a religious act.   The OU stated in its Eastern District Court of New York filing that kosher food production and labeling "is not a religious exercise," (J.E., Part E, page 302 ¶13, page 345).

Contrary to the OU's argument that the OU symbol is somehow religious because it relates to kosher food (Fact 12) the OU told the Federal Court previously that "**Kosher**

**food, in and of itself, has no religious significance**" and "Food that is 'kosher' is merely food that is fit or proper for consumption according to Jewish dietary laws. **That certain foods are designated as 'kosher' does not signify or imply that they have received a special blessing**." (J.E., Part E, page 302 ¶¶14-16, page 345). The OU also said in its Court filings that "**'kashruth' describe[s] the physical characteristics of foods** . . . **the dietary standards are** absolutely clear, entirely undisputed, and **remarkably mundane**. . . **In no event does the determination depend on any spiritual factor. It is solely a question of the food's physical attributes**" J.E., Part E, page 302 ¶13-16, page 324-325 [highlighted] bold added). This position contradicts the OU's current motion.

The plaintiff in that case, Brian Yarmeisch, provided a declaration authenticating these filings and deposition testimony of the OU. J.E. Part E p.301-303. The OU also testified in that case comparing its kosher certification to a certification that a product is dairy free or nut free. J.E. Part E p.303-304 ¶¶16-17.

The OU made similar statements to Markel. Contrary to the OU claims that it has extremely high standards, (facts 15-16), the evidence shows that the OU told Markel that kosher certification "is no more demanding and does not have any higher standards or more difficulty than certifying food as "organic" or "non-GMO" or "Vegan" or "sugar-free" or "Keto Approved" or "Whole30 approved" or "Atkins Approved" or "gluten free" or "whole grain" or "fat-free.""J.E., Part E page 368-369 ¶30. The same level of diligence is required to simply check off the list of approved items and practices and make sure that nothing from the non-approved list is included in the manufacturing of the food products. *Id*. Therefore, the OU is not a religious institution. Instead, the OU's business is does not involve religion.

**B. The OU Received $10 Million of Federal Loan Forgiveness by Representing to the SBA that the OU Was "Most Aptly" Classified as a Food Service Contractor Instead of A Religious Organization.**

The North American Industry Classification System (NAICS) has created hundreds of labels so that each business can self-classify itself into the most appropriate

Case No. 2:19-cv-10704-JWH-SK        PLAINTIFF'S OPP TO MOT SUM JUDGMENT.

category.  The NAICS system is used for all sorts of Federal programs, including the Census Bureau and the SBA.  The OU applied for and received a $10 million loan from the Federal SBA PPP program during the COVID-19 pandemic.  The application (J.E., Part D pages 178-200) was attested to by the OU's CFO Mr. Schwartz.

In the OU's PPP application is stated that potentially two different NAICS codes might apply, either NAICS Code 722310 for "Food Service Contractors" or Code 813110 for "Religious Organizations."  (See J.E. Part E page 733 for the NAICS description of Food Service Contractors and Part E Pages 734-735 for the NAICS description of Religious Organizations).  However, **the OU explained that the OU is "most aptly" categorized as a "Food Service Contractors" meaning the OU is not most aptly categorized as a "Religious Organization"** (J.E., Part D page 183).

Unsurprisingly, the examples provided by the NAICS of other "Food Service Contractors" are for profit businesses which do not engage in any religious actions or content such as "Airline food service contractors, Food concession contractors (e.g., at sporting, entertainment, convention facilities)" (J.E., Part E page 733).  The OU should be bound by their representations.

**C.  Defendants' Testimony in this Case Tacitly Admitted That the Kosher Certification Is Not a Religious Act.**

Defendant testified that the OU pays no heed to the actual meaning of the honorific term "Rabbi" and uses it as internal slang for many of the men who work at the OU, even though the OU knows they are not Rabbis. J.E. Part E pages 638:13-640:20.

Defendant was then asked whether the OU's client's (like Delano) care about whether or not a the kosher supervisor is a Rabbi, Defendant responded:

"A.  I don't know.  I don't really care.

Q. And why don't you care?

A.  Because it's irrelevant to Delano.  If Delano is looking for kosher certification. They're not looking for - -  if [clients] wanted a rabbi they would look up a rabbi for a local synagogue. They're not coming to us because they want to convert to Judaism.

1   They're not coming to us because they want someone to perform marriage.  They're

2   coming to us because they want kosher certification"  J.E. Part E, page 641:22-642:13.

3     Implicit in this statement is the admission that kosher certification is not a

4   religious act.  It is not comparable in any way to a Rabbi's duties, to a synagogue event,

5   to a conversion to Judaism, or to the religious act of officiating a marriage.  Even in the

6   OU's own eyes, kosher certification is separate and distinct from a religious act.

7   Therefore, Markel was not engaged in any religious act and is not a minister.

8     **D. Defendants Incorrectly Rely Upon *Conlon*, and *Schmoll*.**

9     Defendants cite *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 834

10  (6th Cir. 2015) to argue they are a religious institution because their charter discusses

11  judaism.  *Conlon* is unavailing.  In *Conlon* the defendant was a religious organization

12  because was "undisputed" that Intervarsity was "a Christian organization, whose purpose

13  is to advance the understanding and practice of Christianity ***in colleges and***

14  ***universities*."  *Conlon* at 833–34 (emphasis added).  *Conlon's* reasoning is consistent with

15  *Morrissey-Berru*'s reasoning that *"Religious education is vital to many faiths practiced

16  in the United States" Id.* at 2064.  But here, the OU does not fit within *Conlon* because

17  its goal is not religious education.  Instead, as discussed above, kosher certification and

18  trademark licensing is the primary business and generates the the majority of OU's

19  revenue. (J.E. Part E, Pages 657:9-658:6; Page 562 ¶2.).  The fact intensive analysis

20  required by the Supreme Court precludes reliance upon *Conlon* with its different facts.

21    Defendants also cite *Schmoll v. Chapman Univ*., 70 Cal. App. 4th 1434, 1436

22  (1999) to argue the OU qualifies as a religious organization. But *Schmoll*, like *Conlon*

23  held that an institution devoted to religious education at the university level qualified as

24  a religious institution.  *Schmoll* did not extend the ministerial exception to organizations

25  like the OU, nor could it.  Notably, *Schmoll* was disagreed with more recently by *Sumner

26  v. Simpson Univ*., 27 Cal. App. 5th 577, 592, 238 Cal. Rptr. 3d 207, 220 (2018) which

27  held that even when an employee is a minister of a religious institution dedicated to

28

religious education, the employee's claims for breach of contract based upon wrongful termination were not barred by the ministerial exception because: "Reviewing Sumner's contract cause of action will not require the court to wade into doctrinal waters because **review of the breach of contract claim does not require a review of Sumner's religious qualification or performance as a religious leader**. **Defendants have never claimed to have terminated Sumner for religious reasons**," *Sumner* 27 Cal. App. 5th 577, 593–94 (2018) (emphasis added).

Sumner is similar to the instant facts in that Plaintiff resigned and was not fired and is bringing a claim unrelated to wrongful termination. **But, more importantly, here the Defendants never claimed to have failed to pay Markel "for religious reasons"** and this Court's review of Plaintiff's claims does not involve review of any religious qualifications, religious performance or religious doctrine. The Court can freely take up the issue of whether and how much more Markel should have been paid for the time he worked without even touching upon religion.

**E. Defendant Has Not Identified How or Why the Amount Paid to Plaintiff Is a Religious Decision. *Alcazar* Is Completely Inapplicable to the OU.**

Defendants rely primarily on *Alcazar v. Corporation of the Catholic Archbishop of Seattle* (9th Cir. 2010) 627 F.3d 1288 to argue that simply being a church exempts them from ALL employment regulations, including the obligation to actually pay their employees and the obligation to pay overtime and doubletime as required by California law. Defendants' reliance is incorrect. Both the facts and law of *Alcazar* demonstrate it is inapplicable here.

*Alcazar* involved a case where the plaintiff, Rosas entered the seminary of the defendant "'to become a catholic priest and performed his duties in a ministerial placement,' '[a]s part of [his] preparation for ordination into the priesthood,'" *Alcazar* at 1290. *Alcazar* alleged he was entitled to additional payment while he was engaged in his schooling and seminary process to become an ordained Catholic priest. In that context, the Ninth Circuit determined that the amount to be paid to a priest in training by

the church training him for ordination involved a religious issue and implicated the "ministerial exception." *Alcazar* at 1290-1292.

Contrary to Defendants' argument, *Alcazar*'s language limits the decision: "**Our holding today is limited**. . . . **Additionally, we agree with the courts that have held that, if a church labels a person a religious official as a mere 'subterfuge'** to avoid statutory **obligations, the ministerial exception does not apply. .** Similarly, **the ministerial exception may not apply to a seminarian who obtains employment with a church outside the scope of his seminary training**. Here, **Rosas challenges the church's wages for his duties** *as a seminarian*. As part of his seminary training, he alleges, he was placed at St. Mary Parish where he performed duties such as maintenance and assisting with mass. Fairly read, **Rosas' complaint alleges that he performed those duties** *as part of his seminary training*." *Alcazar* at 1292 (emphasis added).

Here, the OU concedes that Markel was not a seminarian and was not engaged in any sort of educational or seminary training as part of an attempt to obtain ordination. Instead, *all of Markel's work* **took place outside of the scope of any "seminary training" because no seminary training ever took place**.  Markel is not, and was never an ordained Rabbi, and the extent of his jewish education completing some of ninth grade at a Jewish high school. J.E. Part E p. 362 ¶7, p.370 ¶39.

*Alcazar* merely stands for the principle that when a minister is in training whether or not some or all of that training is compensable touches upon the religious discretion of the church which is conducting the training.  *Alcazar* held that requiring the church to justify why it does or does not pay its trainees for portions of their religious training runs impermissibly involves the government in religious doctrinal matters.  The Court's reasoning in *Alcazar* recalls the training in the movie Karate Kid, where the menial task of "wax on wax off" was more than just applying polish to a car and was a means to teach martial arts.  In *Alcazar* the Court's concern was that some of Alcazar's labor for the church was designed as religious training to teach a larger religious lesson and

therefore the Court should not involve itself in that decision.  But here, there was never any religious training and the OU simply hired a non-rabbi to further their business interest of making more money licensing their trademark.  No training of any sort took place, and the OU never required Markel to engage in any acts to further his training as a minister because Markel was not being trained as a minister and was working as an employee doing a job unrelated to education or training.

The reasoning in *Alcazar* comports with the Supreme Court's articulated reasons for the ministerial exception as explained in *Hosanna-Tabor* and *Morrissey-Berru* namely that **a church's independence on matters "of faith and doctrine" requires the authority to select, supervise, and if necessary, remove a minister"** *Morrissey-Berru* 140 S.Ct. 2049, 2060–2061 (emphasis added).

Plaintiff's complaint here does not even tangentially touch upon a church's independence on matters of faith or doctrine because no evidence shows that the hourly rate paid (or in this case not paid) to employees of the OU is somehow a religious or doctrinal issue.  Similarly, Plaintiff's allegations are unrelated to the OU's power to "select, supervise and if necessary remove" an OU employee "without interference by secular authorities" because Plaintiff resigned from the OU and none of his claims relate to a wrongful discharge or improper supervision or control of Plaintiff.  Here, Plaintiff alleges that for portions of the time worked, he was **never paid.**

**Defendants' evidence and motion fails to attempt to show that religion played any role in the amount of Plaintiff's pay and whether Plaintiff should be paid for certain hours worked.  Instead, the evidence shows that amounts of payments are a business decision** based upon the income generated from the client paying the OU.

**F.  Other Cases Discussing Religious Entities Show the OU is a Business.**

In *Spencer v. World Vision, Inc.*, 633 F.3d 723, 747 (9th Cir. 2011) the Ninth Circuit looked at the way an institution charged people as one litmus test to determine whether the entity was a religious institution which benefits from the limited exemption

Case No. 2:19-cv-10704-JWH-SK          PLAINTIFF'S OPP TO MOT SUM JUDGMENT.

from Title VII anti-discrimination legislation: "Looking at how an institution charges offers an objective test for sorting out which institutions are designed to exchange goods or services for money, from those designed to give them away except perhaps for nominal charges in order to serve a religious objective.  . . **We can tell much about an institution's purpose by looking at the objective evidence of how it charges**. A religious purpose may be a motive, or money may be a motive, for work that serves others**. If money is not available as an incentive, that is strong evidence, in the purportedly religious institution, that exercise of religion is the objective. If satisfaction of a religious purpose is insufficient to motivate the performance, then the performance may be consistent with religion but not motivated by it.** There is nothing wrong with money as an incentive, but its presence or absence is strong evidence of what the incentive is." *Spencer* at 747. (emphasis added).  As discussed above, the OU does not give away or subsidize its services, it charges a premium for them and sues to ensure it gets paid maximum dollar, further indicating the OU is not a religious entity.

## VI.  PLAINTIFF IS NOT A MINISTER

As discussed above, the minister analysis requires an in depth look at the specific facts of each case.  All of the factors considered by *Hosanna-Tabor* favor Plaintiff not being a minister.  Those factors were "First, Perich's church had given her the title of 'minister, with a role distinct from that of most of its members.' Second, her position 'reflected a significant degree of religious training followed by a formal process of commissioning.' Ibid. Third, she 'held herself out as a minister of the Church' and claimed certain tax benefits. Fourth, her 'job duties reflected a role in conveying the Church's message and carrying out its mission.'" *Morrissey-Berru* 140 S.Ct. 2049 at 2052 citing  *Hosanna-Tabor*.  In addition to the many facts presented above which discuss why kosher supervision was not a religious act, voluminous evidence demonstrates the factors in *Hosanna-Tabor* are disputed.

Here, Markel did not receive a formal title of minister or Rabbi and was instead

called a kosher supervisor (J.E. Part E p. 362 ¶4) and had his title changed arbitrarily by the OU.. (J.E. Part E p.364 ¶17). Markel's role was similar or identical to many of the other kosher supervisors who were also not rabbis. Markel never had an "significant religious training" or any "formal process of commissioning" and instead completed some of ninth grade at a Jewish high school. J.E. Part E p. 362 ¶7, p.370 ¶39.  Notably, the OU used the term Rabbi with total disregard for its religious meaning, using it instead to simply indicate a man who worked at the OU, regardless of whether they were actually a Rabbi.   (J.E. Part E pages 638:13-639:20, 640:20-641:10).

Indeed, kosher supervisors were not required to be Rabbis.  (J.E. Part E p.638:13-19).  Moreover, the OU's kosher supervisors did not have to have any knowledge of judaism or kosher rules: "The people who were hired by the OU [as kosher supervisors] to work at Delano and other locations had no formal Jewish education, had no rabbinical ordination, had not previously worked as a kosher supervisor, did not have any understanding of the technicalities of the kosher laws." J.E. p. 370 ¶39.

Markel was not a Rabbi, never claimed to be a Rabbi, never held himself out as a Rabbi and never received Rabbinic Ordination. (J.E. Part E p. 362 ¶¶5-6). Finally, Markel's job did not involve any role in conveying the OU's message or mission, he was a worker at a factory not interacting, teaching or preaching to anyone on behalf of the OU. (J.E. Part E p. 369-370 ¶¶33-38).  In fact, Markel never had a role interacting with the outside community on behalf of the OU.  *Id.*

When Markel carried out things like washing vats, the OU dictated the temparature of the water based upon "the science of boiling points and temperatrues for the heating of metals." He was even told by the OU that an OU employee was not required to participate in the cleaning or koshering of the tanks.  J.E. Part E. 369 ¶31.

Markel similarly had no discretion at all to make decisions regarding OU policy. Instead, he followed the rules set by the OU. *Id.* Markel also did not create OU policy or have discretion to modify OU rules.  J.E. Part E. 362 ¶¶10-12, 363 ¶¶14-15, 364 ¶¶16,

18, 365 ¶20, 366 ¶21. The OU also conceded that non-Jewish people do to many parts of Markel's job and told that to Markel. J.E. Part E. 368 ¶28.

Markel was not a minister, had no religious title or authority, no religious duties, and was hired as an employee to allow the OU to make more money licensing its trademark.  The OU is not a religious entity and even if it is, Plaintiff is not a minister under any test or set of facts.  At a minimum, the facts which underlie any determination on this issue are disputed and should be reserved for trial.

## VII.  PLAINTIFF'S CLAIMS FOR FRAUD, UNLAWFUL BUSINESS PRACTICES, AND CLAIMS AGAINST RABINOWITZ ARE NOT PRECLUDED BY THE MINISTERIAL EXCEPTION.

Not a single case cited by Defendants applied the ministerial exception to fraud. The fraud here was the OU and Rabinowitz's promise that Markel would receive more money and a salary in order to induce Plaintiff to continue to work for Defendants. Defendants provided all sorts of excuses over the years for why they were not delivering on their promise and continued to string Plaintiff along to his detriment.  However, none of that is at issue in the current motion because the only issue noticed and briefed is whether the ministerial exception is an applicable affirmative defense.  Defendants have not met their burden to demonstrate the ministerial exception ever touches upon fraud and there is no basis to summarily adjudicate this claim even if the ministerial exception did apply.

## CONCLUSION

All material facts are disputed.  The ministerial exception is inapplicable in this case to the claims of unpaid wages.  Moreover, the OU is not a religious entity and Markel is not a minister engaged in ministerial or religious work.  Summary judgment should be denied in its entirety.

DATED: October 14, 2022     _____

Michael E. Friedman
Attorney for Plaintiff Yaakov Markel

1

## CERTIFICATE OF SERVICE

2

3

**UNITED STATES DISTRICT COURT - CENTRAL DISTRICT OF CALIFORNIA**

4

5

CASE NAME: Yaakov Markel v. Union of Orthodox Jewish Congregations of America
CASE NUMBER: 2:19-cv-10704-JWH-SK

6

7

8

     I am a resident of and/or employed in the county of Los Angeles, State of California; I am over the age of eighteen years and not a party to the within entitled action; my business address is 1880 Century Park East, Suite 1411, Los Angeles, California 90067.

9

10

     On October 14, 2022,  I served the within document(s) described as:
**PLAINTIFF YAAKOV MARKEL'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT.**

11

12

13

...on the interested parties in this action, by electronic delivery of a true and correct copy thereof at Los Angeles, California, and addressed as follows:

14

15

16

17

18

19

Leaona m. Schloss (SBN 145142)      Attorneys for Defendants
Kevin D. Finley (SBN 318193)        UNION OF ORTHODOX JEWISH
Jackson Lewis, PC                      CONGREGATIONS OF AMERICA
725 So. Figueroa St, Suite 2500      and NACHUM RABINOWITZ
Los Angeles, CA 90017-5408
213 689-0404
Leonora.Schloss@jacksonlewis.com
Kevin.Finley@jacksonlewis.com

20

21

22

[X] BY CM/ECF: With the Clerk of the United States District Court of California, using the CM/ECF System. The Court's CM/ECF System will send an e-mail notification of the foregoing filing to the foregoing parties and counsel of record who are registered with the Courts CM/ECF System.

23

Executed on October 14, 2022,  at Los Angeles, California.

24

[ X ]  (Federal)     I declare that I am employed in the office of a member of the bar of the United States District Court for the Central District of California at whose direction the service was made.

25

26

_____
Michael E. Friedman

27

28

Case No. 2:19-cv-10704-JWH-SK        PLAINTIFF'S OPP TO MOT SUM JUDGMENT.